UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DENISE ROCK,
     Plaintiff,


v.                                 CIVIL ACTION NO.
                                       13-11833-MBB

LIFELINE SYSTEMS COMPANY,
     Defendant.


**MEMORANDUM AND ORDER RE:**
**DEFENDANT LIFELINE SYSTEMS COMPANY'S PARTIAL MOTION TO DISMISS**
**COMPLAINT (DOCKET ENTRY # 8)**

**April 22, 2014**

**BOWLER, U.S.M.J.**

Pending before this court is a partial motion to dismiss
(Docket Entry # 8) filed by defendant Lifeline Systems Company
("Lifeline") pursuant to Fed.R.Civ.P. 12(b)(6) ("Rule
12(b)(6)"). Plaintiff Denise Rock ("Rock") opposes the motion.
(Docket Entry # 13). After conducting a hearing on January 23,
2014, this court took the motion (Docket Entry # 8) under
advisement.

<u>PROCEDURAL HISTORY</u>

The amended complaint alleges that Lifeline engaged in
gender and age discrimination in violation of Massachusetts and
federal law, wrongful termination of employment in violation of
Massachusetts and federal law, and retaliation in violation of
Massachusetts law and federal law. (Docket Entry # 4). It sets

out the following causes of action:  (1) violation of

Massachusetts General Laws chapter 151B ("chapter 151B") for

discrimination on the basis of gender (Count I); (2) violation

of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e ("Title

VII"), for discrimination on the basis of gender (Count II); (3)

violation of chapter 151B for discrimination on the basis of age

(Count III); (4) violation of Title VII and the Age

Discrimination in Employment Act, 29 U.S.C. § 621 et seq., for

discrimination on the basis of age (Count IV); (5) violation of

public policy under Massachusetts common law for wrongful

termination of employment (Count V); (6) violation of the

whistleblowing protections of the Sarbanes-Oxley Act ("SOX"), 18

U.S.C. § 1514A ("section 1514A") (Count VI); (7) violation of

chapter 151B for retaliation (Count VII); (8) violation of Title

VII for retaliation (Count VIII); and (9) violation of the

whistleblowing protections of the Consumer Product Safety

Improvement Act ("CPSIA"), 15 U.S.C. § 2087 ("section 2087")

(Count IX).  (Docket Entry # 4).  The motion seeks to dismiss

counts one, two, five and nine.  (Docket Entry # 8).

### STANDARD OF REVIEW

In conducting a Rule 12(b)(6) analysis, a court "accept[s]

as true all well pleaded facts in the complaint and draw[s] all

reasonable inferences in favor of the plaintiffs."  Gargano v.

Liberty International Underwriters, Inc., 572 F.3d 45, 48 (1st

Cir. 2009). "To survive a motion to dismiss, the complaint must allege 'a plausible entitlement to relief.'" <u>Fitzgerald v. Harris</u>, 549 F.3d 46, 52 (1st Cir. 2008). While "detailed factual allegations" are not required, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement for relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." <u>Bell Atlantic v. Twombly</u>, 550 U.S. 554, 555 (2007); <u>Maldonado v. Fontanes</u>, 563 F.3d 263, 266 (1st Cir. 2009); <u>Thomas v. Rhode Island</u>, 542 F.3d 944, 948 (1st Cir. 2008). Additionally, "a well-pleaded complaint may succeed even if . . . actual proof of those facts is improbable." <u>Bell Atlantic v. Twombly</u>, 550 U.S. at 556.

In evaluating a Rule 12(b)(6) motion, a court may consider inter alia "'documents central to the plaintiffs' claim," "'documents sufficiently referred to in the complaint,'" and "'documents the authenticity of which are not disputed by the parties.'" <u>Curran v. Cousins</u>, 509 F.3d 36, 44 (1st Cir. 2007); <u>see</u> <u>also</u> <u>Trans-Spec Truck Service, Inc. v. Caterpillar Inc.</u>, 524 F.3d 315, 321 (1st Cir. 2008); <u>Watterson v. Page</u>, 987 F.2d 1, 3 (1st Cir. 1993). Lifeline attaches an affidavit with exhibits consisting of the U.S. Food and Drug Administration ("FDA") website printouts (Docket Entry # 11) to its memorandum in support of the partial motion to dismiss. (Docket Entry # 9). Lifeline maintains that this court can take judicial notice of

the FDA website printouts. (Docket Entry # 9). The exhibits
are relevant to Count IX and their inclusion in the record is
addressed in the discussion section with respect to this count.

FACTUAL BACKGROUND

I. <u>Administrative Proceedings</u>

On April 26, 2012, Rock filed a charge of discrimination
with the Massachusetts Commission Against Discrimination
("MCAD") and the U.S. Equal Employment Opportunity Commission
("EEOC") against Lifeline alleging discrimination on the basis
of her age and sex. (Docket Entry # 4, ¶ 29). Lifeline
received the charge around the first week of May 2012. (Docket
Entry # 4, ¶ 29). On May 7, 2012, Rock filed a charge in
violation of the whistleblower protections of SOX with the U.S
Department of Labor ("DOL"). (Docket Entry # 4, ¶ 4). Rock
"later added . . . a charge of violation of the whistleblower
provisions of [CPSIA]." (Docket Entry # 4, ¶ 4).

On June 14, 2012, Lifeline terminated Rock's employment.
(Docket Entry # 4, ¶ 29). On December 14, 2012, Rock filed a
second charge of discrimination with the MCAD and the EEOC
alleging discrimination on the basis of her age, sex and
retaliation. (Docket Entry # 4, ¶ 4). On March 22, 2013, Rock
requested to withdraw the charges of wrongful termination with
the DOL because no determination on her claims had been made
within 180 days of filing her claim. (Docket Entry # 4, ¶ 5).

4

On May 9, 2013, the EEOC issued a right to sue letter. (Docket Entry # 4, ¶ 5).

II.  Factual Background

Up until her termination, Rock was employed at Lifeline for 12 years as a sales person or, to use the formal title, an "'account representative.'" (Docket Entry # 4, ¶ 9). Lifeline, "also known as Lifeline Systems, Inc., Philips Lifeline or Philips," is a subsidiary or "sister" company of Royal Philips Electronics ("Royal"). (Docket Entry # 4, ¶ 9). Rock initially worked at Lifeline Systems, Inc. beginning in 2000. (Docket Entry # 4, ¶ 9). Thereafter, she also worked at Philips Lifeline, which subsequently changed its name to Lifeline Systems Company, i.e., Lifeline. (Docket Entry # 4, ¶ 10).

Royal acquired Lifeline in 2006 and Health Watch, Inc. ("Health Watch") in 2007. (Docket Entry # 4, ¶ 12). Both Lifeline and Health Watch manufacture and sell devices that provide medical alert warnings from a customer's residence to a central location from which assistance can be provided. (Docket Entry # 4, ¶ 12). Subscribers to "the Lifeline System" "wear a button around their neck or wrist, and in case of emergency they press the button that transmits a signal to a transmitter in their home, which in turn will transmit an emergency response to a trained response associate 24 hours a day, 365 days a year." (Docket Entry # 4, ¶ 12).

Rock was born in 1957 and was one of the oldest salespeople in her department. (Docket Entry # 4, ¶¶ 6 & 28). Throughout her employment, Rock was "consistently in the top 4 or 5 performers in her department in terms of sales and revenue results." (Docket Entry # 4, ¶ 10). She "performed her job in an excellent fashion." (Docket Entry # 4, ¶ 10).

In September 2007, Rock learned from a Health Watch manager that a "patient death in a fire had likely been caused by faulty Health Watch equipment, and that at least six other subscribers had died in similar circumstances." (Docket Entry # 4, ¶ 13). Rock told the manager that, "the matter would have to be reported to [Lifeline]." (Docket Entry # 4, ¶ 13). The manager, however, "asked [Rock] to promise that she would not report it." (Docket Entry # 4, ¶ 13) (emphasis in original).

Rock immediately reported the conversation to a "Philips attorney" on the Health Watch Acquisition Team ("the quality team"). (Docket Entry # 4, ¶ 14). The attorney did not respond to her September 25, 2007 email. (Docket Entry # 4, ¶ 14). Rock then "forwarded the email to another attorney who was a Philips Ethics Officer." (Docket Entry # 4, ¶ 14). The second attorney "responded to the email and stated that he had spoken to the first attorney, and that [Rock] would be called so the Company could look into this 'Product Liability' matter." (Docket Entry # 4, ¶ 14). Shortly after Rock "reported this

information, the Health Watch Acquisition Team put together an aggressive plan to 'swap' Health Watch equipment ahead of [an] original schedule."  (Docket Entry # 4, ¶ 14).

In early October 2007, Rock learned that her "job and compensation were being changed in a manner which would clearly result in her having less income."  (Docket Entry # 4, ¶ 16). As noted, she was one of the top performers in her department in both "sales and revenue results."  (Docket Entry # 4, ¶ 10). Rock's job performance did not justify the changes.  (Docket Entry # 4, ¶ 16).  In November 2007, Rock informed two of the Philips' attorneys that "it was her belief that she was being retaliated against for reporting the fire deaths."  (Docket Entry # 4, ¶ 16).

In 2008, Rock received a "low performance evaluation which was particularly critical regarding 'communications and effective working relations.'"  (Docket Entry # 4, ¶ 17).  She "received a 4% bonus rather than the 12% to 18% bonus that she should have earned for exceeding her sales goals."  (Docket Entry # 4, ¶ 17).  The bonus reduction was "one of a number of the actions Philips Lifeline/Lifeline Systems took against [Rock] . . . to make her job as unpleasant as possible in the hope that she would resign."  (Docket Entry # 4, ¶ 17).

In early 2009, Rock learned that at least one patient had died due to strangulation "by a Lifeline cord."  (Docket Entry #

4, ¶ 18).  Rock "informed a Product Marketing Manager that she
would refuse to respond to inquiries about this by giving a
misleading statement."  (Docket Entry # 4, ¶ 18).

On October 1, 2009, Rock learned that another subscriber's
Lifeline equipment had "caught fire while plugged into an
electrical outlet."  (Docket Entry # 4, ¶ 19).  This was the
first time Rock learned that the Lifeline units, as opposed to
just the Health Watch units, "had issues with catching fire."
(Docket Entry # 4, ¶ 19).  The burned equipment was "submitted
for testing."  (Docket Entry # 4, ¶ 19).  Upset that the
Lifeline units might cause fires and deaths, Rock contacted the
first attorney she contacted in 2007 and informed the attorney
that one of the "Lifeline units had spontaneously burst into
flames."  (Docket Entry # 4, ¶ 19).  The attorney assured her
that the quality team was working on the matter.  (Docket Entry
# 4, ¶ 19).

On December 17, 2009, Rock learned "that two Lifeline
subscribers had died in a fire."  (Docket Entry # 4, ¶ 20).  She
informed her supervisor, "who made light of the issue."  (Docket
Entry # 4, ¶ 20).  She then emailed an attorney she had spoken
to in 2007.  (Docket Entry # 4, ¶ 20).  He informed her to
contact the first attorney she spoke to in 2007.  (Docket Entry
# 4, ¶ 20).  Around this time period, "Rock began to hear rumors
that she was going to be fired."  (Docket Entry # 4, ¶ 20).

In late 2009, Rock met with a person on the quality team "to discuss the Lifeline product defect." (Docket Entry # 4, ¶ 21). She left the meeting "feeling hopeless." (Docket Entry # 4, ¶ 21). She now believed that Lifeline would not reveal the problems to subscribers or the public. (Docket Entry # 4, ¶ 21). She "knew that the matter would not be properly handled, based upon the way the Health Watch equipment issues had been handled." (Docket Entry # 4, ¶ 21).

In 2010, Rock again received a "negative review, with an overall low rating despite that fact that her manager had told her how well she was doing." (Docket Entry # 4, ¶ 22). "Virtually all members of [Rock's] sales team received merit increases in 2010, with the exception of [Rock]." (Docket Entry # 4, ¶ 22). She did not receive an explanation for the denial of a merit raise. (Docket Entry # 4, ¶ 22). Thereafter, she complained to human resources that her whistleblowing was the cause of the negative review. (Docket Entry # 4, ¶ 22). The treatment continued through 2011 and 2012. (Docket Entry # 4, ¶ 22).

In late 2011, Rock's attorney contacted a number of present as well as past Lifeline employees "who had dealt with [Rock]" and inquired about the "defective products." (Docket Entry # 4, ¶ 23). Shortly after these telephone calls, "the retaliation against [Rock] dramatically increased." (Docket Entry # 4, ¶

24).  Around the same time period, Rob Wolf ("Wolf") became the area vice president of sales for corporate accounts at Lifeline.[1] (Docket Entry # 4, ¶ 25).  He was a friend of several employees "involved with the Health Watch transition" and "were aware of [Rock's] reporting."  (Docket Entry # 4, ¶ 25).  Wolf "displayed an intense dislike" for Rock and joined with these employees "to compel Rock to resign" or terminate her employment.  (Docket Entry # 4, ¶ 25).

In January 2012, Wolf placed Rock on a two month Performance Improvement Plan ("PIP").  (Docket Entry # 4, ¶ 27).  The PIP was "unjustified" and established "unrealistic and unattainable goals" for her to achieve.  (Docket Entry # 4, ¶ 27).  On March 12, 2012, Rock was given a "'Final Warning Letter' regarding supposedly unsatisfactory job performance."  (Docket Entry # 4, ¶ 27).

"Younger employees, male employees, and in particular younger female employees" at Lifeline were "held to a less strict performance standard" than Rock.  (Docket Entry # 4, ¶ 24).  By the middle of 2011, Rock "was meeting her goals, and she eventually exceeded her year end revenue goal, placing fifth in her department, an excellent result."  (Docket Entry # 4, ¶ 28).  She was "responsible for 30% of the Company's equipment

_____
[1]  Wolf replaced a male who held the same position.  (Docket Entry # 4, ¶ 25).

revenue for January 2012." (Docket Entry # 4, ¶ 28).

"Underperforming younger employees in her department were given
better reviews" than Rock and were not placed on a PIP. (Docket
Entry # 4, ¶ 28). Whereas Rock's PIP criticized "her 'call
volume,'" younger as well as male employees were not criticized
for their lower call volume statistics. (Docket Entry # 4, ¶
28(3)). Younger coworkers in her department were not
disciplined or criticized for socialization and inattentiveness.
(Docket Entry # 4, ¶ 28). A number of younger employees also
"surfed the internet" and made few work calls during the day yet
were not criticized or disciplined for such conduct. (Docket
Entry # 4, ¶ 28).

A Senior Human Resources Manager also told Rock "that she
should not bother to spend the time to defend her work in
response to an unfair evaluation she had received." (Docket
Entry # 4, ¶ 28). Rock "overheard a manager say that the way to
'get rid of' an employee who is performing satisfactorily in
terms of their statistics, is to criticize them for their 'job
skills,' which was one of the techniques used against [Rock]."
(Docket Entry # 4, ¶ 28).

In early April 2012,[2] Rock "became aware that certain of
Lifeline's 'AutoAlert Help Buttons' might not be operating

_____

[2] The amended complaint refers to the date as April 2013, a time when
Rock no longer worked at Lifeline. (Docket Entry # 4). This court draws the
reasonable inference that the correct year is 2012.

11

properly, might be defective, and that users of the Lifeline System might have suffered injuries or death as a result . . .." (Docket Entry # 4, ¶ 30).  A suspect button was submitted for testing by Lifeline after an incident involving a customer falling and it "had been found not to be functioning normally during laboratory tests, due to a faulty aspect of the button." (Docket Entry # 4, ¶ 30).  Rock was "told by the technician who performed the testing that she should not discuss this information with the customer."[3]  (Docket Entry # 4, ¶ 30).  Rock stayed involved in the investigation of the button failure. (Docket Entry # 4, ¶ 31).

Later in April 2012,[4] Rock learned that a second button had failed to detect a fall.  (Docket Entry # 4, ¶ 32).  Although the button was purportedly "sent to Lifeline for testing after the incident, Lifeline technicians claimed that they never received [it], and that it had been lost in the process of being transmitted to them."  (Docket Entry # 4, ¶ 32).

In late April 2012,[5] Rock "wrote to the Lifeline technician and several Managers asking why the information regarding the defective units would not be reported to customers so that

---

[3]  Like other third party statements in the amended complaint, this statement is not considered for the truth of the matter asserted.

[4]  See fn. 2.

[5]  See fn. 2.

customers and subscribers to Lifeline System[s] could make informed decisions regarding the use of the system." (Docket Entry # 4, ¶ 33). Rock was told that she should direct her requests through Lifeline's legal department. (Docket Entry # 4, ¶ 33).

On June 7, 2012,[6] Rock learned of a third button that had malfunctioned, resulting in an undetected fall that led to a customer's death. (Docket Entry # 4, ¶ 35). Technical support initially told Rock "that the 'button' was not defective," but later told her that it was never received by Lifeline and thus never tested. (Docket Entry # 4, ¶ 35). The customer insisted that the button had been sent for testing and Rock informed technical support that the button had been sent to Lifeline. (Docket Entry # 4, ¶ 35).

On June 11, 2012,[7] Rock sent an email "to the Technical Support and Quality Managers at Lifeline, explaining the situations with the three 'buttons,' expressing her concern that allegedly defective equipment had been 'lost' three times, that she had been informed of other defective AutoAlert Help Buttons, and asking what Lifeline's obligation was to report to customers the results of equipment sent back for testing." (Docket Entry # 4, ¶ 36). On June 14, 2012, Rock sent an additional email as

_____

[6] See fn. 2.

[7] See fn. 2.

13

she had not heard back from either technical support or the
quality managers.[8]  (Docket Entry # 4, ¶ 37).  Shortly
thereafter, on June 14, 2012, Rock was informed that her
employment was terminated.  (Docket Entry # 4, ¶¶ 1 & 37).
Lifeline hired a female in her thirties to replace Rock.
(Docket Entry # 4, ¶ 26).  "[H]er territory was given to a male
employee in his 40s who had been with the company for several
years."  (Docket Entry # 4, ¶ 26).

DISCUSSION

I.  Gender Discrimination (Counts I and II)

Lifeline argues that counts one and two are subject to Rule
12(b)(6) dismissal because the amended complaint fails to allege
a prima facie case of gender discrimination.  (Docket Entry # 8,
p. 1).  Specifically, with respect to the fourth element,
Lifeline contends that Rock fails to allege that an individual
outside Rock's protected class received favorable treatment or
was hired in her place.  (Docket Entry # 8, p. 1).  Rock submits
that the prima facie case for gender discrimination does not
require a showing of "comparator evidence" and that a
demonstration of discriminatory animus and causation by "proof
of pretext" is sufficient to survive dismissal.  (Docket Entry #
13, pp. 6 & 7).

---

[8]  See fn. 2.

Lifeline and Rock disagree on the appropriate prima facie
showing for gender discrimination under chapter 151B and Title
VII.  (Docket Entry # 8 & # 13).  Under the paradigm set forth
in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04
(1973), the plaintiff employee bears the initial burden of
showing a prima facie case for discrimination by a preponderance
of the evidence.  The burden then shifts to the defendant
employer "to articulate some legitimate, nondiscriminatory
reason" for its adverse employment action against the
plaintiff."  See Texas Dep't of Cmty. Affairs v. Burdine, 450
U.S. 248, 248 (1981).  The final burden rests upon the plaintiff
employee to "submit evidence that the defendant's articulated
reason for the termination was not the real one, but a pretext,
or cover-up, for the discriminatory motive underlying the
plaintiff's termination."  Knight v. Avon Products, Inc., 780
N.E.2d 1255, 1262, n.4 (Mass. 2003); see Loeb v. Textron, Inc.,
600 F.2d 1003, 1012 (1st Cir. 1979).

"'The analysis of a gender discrimination claim is
essentially the same under the State and Federal statutes.'"
Beal v. Board of Selectmen of Hingham, 646 N.E.2d 131, 138 n.5
(Mass. 1995) (internal brackets omitted).  Ordinarily, "a
plaintiff establishes a prima facie case by showing that (1)
[she] is a member of a protected class; (2) [she] was qualified
for the job; (3) the employer took an adverse employment action

15

against [her]; and (4) the position remained open or was filled by a person with similar qualifications." Kosereis v. Rhode Island, 331 F.3d 207, 213 (1st Cir. 2003); accord Garcia v. Bristol-Myers Squibb Co., 535 F.3d 23, 31 n.2 (1st Cir. 2008).

"The last two elements may 'vary according to the nature of the plaintiff's claim.'" Cham v. Station Operators, Inc., 685 F.3d 87, 93 (1st Cir. 2012) (internal brackets omitted); Abramian v. President & Fellows of Harvard College, 731 N.E.2d 1075, 1084 (Mass. 2000) (elements of chapter 151B prima facie case "'may vary depending on the specific facts of a case'"). Another formulation of the fourth element in a prima facie gender discrimination case resulting in termination is that the "employer sought a replacement with similar qualifications." Beal v. Board of Selectmen of Hingham, 646 N.E.2d at 138; accord White v. University of Massachusetts at Boston, 574 N.E.2d 356, 358 (Mass. 1991) (stating fourth element in gender discrimination wrongful termination case as "employer sought a replacement with similar qualifications"); Gomez-Gonzalez v. Rural Opportunities, Inc., 626 F.3d 654, 662 (1st Cir. 2010) (fourth element of "prima facie case of gender-based discriminatory discharge under Title VII" is that "employer sought someone of roughly equivalent qualifications to perform substantially the same work").

In reduction in force cases, however, "the fourth prong is unworkable because the plaintiff's position no longer exists." Lewis v. City of Boston, 321 F.3d 207, 214 n.6 (1st Cir. 2003). The two reduction in force cases cited and relied upon by Rock[9] are therefore distinguishable.

The prima facie framework is nonetheless "not a mechanical exercise." Sanchez v. Puerto Rico Oil Co., 37 F.3d 712, 719 (1st Cir. 1994). Furthermore, in a 1990 First Circuit case, the court noted that, "[W]e have never held that the fourth element of a prima facie discharge case can be fulfilled *only* if the complainant shows that she was replaced by someone outside the protected group. Indeed, we have said precisely the opposite." Cumpiano v. Banco Santander Puerto Rico, 902 F.2d 148, 155 (1st Cir. 1990) (gender discrimination brought by former female employee) (emphasis added). Cumpiano thus held "that, in a case where an employee claims to have been discharged in violation of Title VII, she can make out the fourth element of her prima facie case without proving that her job was filled by a person not possessing the protected attribute" and that "a complainant can satisfy the fourth prong of her prima case simply by showing

_____

[9] Sullivan v. Liberty Mutual Insurance Co., 825 N.E.2d 522 (Mass. 2005), and Trustees of Health & Hospitals of City of Boston, Inc. v. Massachusetts Commission Against Discrimination, 871 N.E.2d 444 (Mass. 2007). In fact, the Sullivan court acknowledges that, "the fourth element is nonsensical in a reduction in force case: the plaintiff is not replaced, nor does her employer 'seek to fill' the position, for the very purpose of a workforce reorganization is generally to reduce the number of employees." Sullivan v. Liberty Mutual Insurance Co., 825 N.E.2d at 531.

17

that . . . the employer had a continued need for 'someone to perform the same work after the complainant left.'" Id. (internal brackets omitted); see Miles v. Dell, Inc., 429 F.3d 480, 487 n.3 (4th Cir. 2005) (collecting case law); Pivirotto v. Innovative Systems, Inc., 191 F.3d 344, 353 (3rd Cir. 1999) (noting "that seven of the eight federal courts of appeals to have addressed it have held that a plaintiff need not prove, as part of her prima facie case, that she was replaced by someone outside of the relevant class"); see Caesar v. Shinseki, 887 F.Supp.2d 289, 303 (D.Mass. 2012) (dicta noting that while "'attributes of a successor employee may have evidentiary force in a particular case,' plaintiff is certainly not required to prove 'that her job was filled by a person not possessing the protected attribute'"); Douglas v. J.C. Penney Co., Inc., 422 F.Supp.2d 260, 273 (D.Mass 2006) (fact that plaintiff, a male, "was replaced with a male has 'evidentiary force,' but does not defeat his prima facie case").

In the case at bar, Lifeline hired another female to replace Rock as a sales representative. Lifeline however gave her territory to a male employee who, viewing the record in Rock's favor, assumed the duties of Rock's position. Giving Rock's territory to a male employee coupled with an adequate showing that Lifeline had a continued need "for 'someone to perform the same work after the complainant left,'" Cumpiano v.

18

Banco Santander Puerto Rico, 902 F.2d at 155, as shown by the
fact that it hired a replacement, provides an adequate showing
to satisfy the relatively easy burden of the prima facie
showing.  See Kosereis v. Rhode Island, 331 F.3d at 213 (prima
facie showing "is not onerous and is easily made") (omitting
citation and internal quotation marks).  Lifeline's argument
seeking dismissal on the basis of Rock's failure to meet the
fourth element of a prima facie case is therefore unavailing.

        Citing paragraph 24 of the first amended complaint,
Lifeline argues that Rock cannot state a claim of gender
discrimination "when she unequivocally alleges that the
employees who she claims were treated more favorably than she
was were female."  (Docket Entry # 9).  It is true that
paragraph 24 states that Lifeline held "younger female
employees" to a less strict performance standard than Rock.  The
paragraph also alleges however that Lifeline held "male
employees" to a less strict performance standard than Rock.
Lifeline therefore overstates the significance of the allegation
and, accordingly, it does not provide a sufficient basis to
dismiss counts I and II.

        Lifeline next contends that, "[Rock] has not pled that male
employees with performance issues similar to hers were not
terminated or disciplined by Lifeline."  (Docket Entry # 9).
Rock is not required to offer and analyze comparator evidence as

part of the prima facie case.  See Cham v. Station Operators,
Inc., 685 F.3d at 94 n.4 ("'time to consider comparative
evidence in a disparate treatment case is at the third step of
the burden-shifting ritual . . .,' as opposed to as part of a
plaintiff's prima facie case"); Conward v. Cambridge School
Committee, 171 F.3d 12, 19 (1st Cir. 1999); see also Fernandes v.
Costa Brothers Masonry, Inc., 199 F.3d 572, 584-585 (1st Cir.
1999).

In sum, with respect to Lifeline's arguments, the first
amended complaint states a plausible entitlement to relief with
respect to counts I and II.

## II.  Wrongful Termination (Count V)

Lifeline seeks to dismiss Count V because section 1514A of
SOX, which Rock invokes in Count VI, preempts the common law
claim of wrongful termination in violation of public policy.
Lifeline also argues that Rock bases her wrongful termination
claim on whistleblowing and, because section 1514A of SOX
provides her a comprehensive remedy, she cannot maintain a
wrongful termination claim based on the public policy exception
to at-will employment.  (Docket Entry # 9, pp. 7-8).  Thus,
according to Lifeline, the common law claim "may not be invoked
when, as here, there is an adequate statutory remedy."  (Docket
Entry # 9, p. 8).

Rock reasons that because "[t]here has been no determination that [Rock's] specific claims are covered by [SOX's] whistleblower protections," it is "premature to rule on whether or not [her] claims under [SOX] are preempted by her state wrongful termination in violation of public policy claims." (Docket Entry # 13, p. 3). In light of the ability to plead claims alternatively or inconsistently, Rock argues that such a determination is appropriate for consideration after discovery upon summary judgment. (Docket Entry # 13, p. 3).

The purpose of SOX is to "[protect] 'whistleblower' employees of publicly-traded companies by prohibiting employers from retaliating against employees because they provided information about specified potentially unlawful conduct." Day v. Staples, Inc., 555 F.3d 42, 52 (1st Cir. 2009). As explained in Day:

> Those types of [unlawful] conduct fall into three broad categories: (1) a violation of specified federal criminal fraud statutes: 18 U.S.C. § 1341 (mail fraud), § 1343 (wire fraud), § 1344 (bank fraud), § 1348 (securities fraud); (2) a violation of any rule or regulation of the [Securities and Exchange Commission]; and/or (3) a violation of any provision of federal law relating to fraud against shareholders.

Id. at 54-55. SOX provides a private cause of action that:

> authorizes an award of make-whole relief to an employee who prevails in the DOL administrative proceedings. This can include reinstatement with "the same seniority status that the employee would have had but for the discrimination," "back pay, with interest," and

21

compensation for any special damages sustained, including
litigation costs, and reasonable attorneys' fees.

Day v. Staples, Inc., 555 F.3d at 53; see 18 U.S.C. §

1514A(c)(2); see also 29 C.F.R. § 1980.105(a).

Turning to Lifeline's argument that SOX provides a
comprehensive remedy for whistleblowing, Massachusetts law
recognizes a common law claim "'for employees who are terminated
for asserting a legally guaranteed right (e.g., filing workers'
compensation claim), for doing what the law requires (e.g.,
serving on a jury), or for refusing to do that which the law
forbids.'" Acher v. Fujitsu Network Communications, Inc., 354
F.Supp.2d 26, 29 (D.Mass. 2005). "Similarly, an employee may
not be terminated for assisting in an ongoing governmental
investigation into illegal conduct, or reporting suspected
violations of safety standards that present a threat to the
safety of the population at large." Id. (internal citations
omitted); see Dineen v. Dorchester House Multi-Serv. Ctr., Inc.,
2014 WL 458188, at *3 (D.Mass. Feb. 3, 2014) (courts "'justify
legal redress in certain situations for employees terminated for
performing important public deeds, even though the law does not
absolutely require the performance of such a deed'" and
whistleblowing "'may' fall into this category"). The
Massachusetts Supreme Judicial Court ("SJC") makes clear however
"that 'a statute itself may provide that an employer may not

terminate an employee for exercising rights conferred by the statute, and in such a case, the common law public policy exception is not called into play.'"  Id. at *4; King v. Driscoll, 638 N.E.2d 488, 494 n.7 (Mass. 1994); Valerio v. Putnam Associates Inc., 173 F.3d 35, 45-46 (1st Cir. 1999) (agreeing with lower court "that Massachusetts does not appear to recognize a common law cause of action [for wrongful termination] where the relevant public policy has already been vindicated by a state or federal statute").  The court in Valerio therefore affirmed the district court's allowance of summary judgment on a wrongful termination in violation of public policy claim as precluded by the federal remedy under Fair Labor Standards Act.  Id.  In other words, when an "employee is terminated for exercising her statutory right, and the statute provides the employee with a statutory remedy for that type of retaliatory termination, the statutory remedy preempts the common-law wrongful-discharge claim." Crevier v. Town of Spencer, 600 F.Supp.2d 242, 265 (D.Mass. 2008). Finally, the SJC "consistently" interprets the "public policy exception narrowly."  King v. Driscoll, 638 N.E.2d at 492.

SOX constitutes comprehensive and pervasive legislation that provides a statutory remedy for whistleblowing by employees in publicly-traded companies.  See Day v. Staples, Inc., 555 F.3d at 52, 59-60.  The First Circuit in Day allowed summary

judgment in favor of Staples, Inc. on a common law wrongful

termination claim based on the public policy exception to at-

will employment because of the comprehensive framework of SOX:

> Day does not have a claim for wrongful termination under
> Massachusetts common law. In passing SOX, Congress aimed
> to create comprehensive legislation to fill the gaps in a
> patchwork of state laws governing corporate fraud and
> protections for whistleblowers. It would be entirely
> inappropriate for plaintiff to be able to use a federal
> statute designed to address the inadequacies of state law
> to create a new common law cause of action under
> Massachusetts law.

Id. at 59-60. A statutory framework does not need to be

"comprehensive" for it to prohibit a common law claim for

wrongful termination. See Dineen v. Dorchester House Multi-

Serv. Ctr., Inc., 2014 WL 458188, at *5 (the SJC, "the final

arbiter of the contours of the exception to the common law rule,

never imposed the term 'comprehensive' as a precondition").

In the case at bar, the allegations that give rise to

Rock's common law claim arise from the same set of facts giving

rise to her SOX claim. (Docket Entry # 4); see Dineen v.

Dorchester House Multi-Serv. Ctr., Inc., 2014 WL 458188, at *4

(denying plaintiff ability to plead common law claim for

wrongful termination in violation of public policy when "[h]er

common law claim not only invokes the same public policy

established by the federal statute, it arises from the very acts

giving rise to her federal claim"). Rock alleges in the amended

complaint that she "was fired for doing what the law requires,

namely reporting to her supervisors and managers improper
activities which she believed violated various laws, rules and
regulations, and which caused a serious danger to the public
health and safety." (Docket Entry # 4, ¶ 48). The facts
supporting the SOX claim are premised on "providing information
to persons with supervisory authority over her and persons
having the authority to investigate, discover or terminate
misconduct, with regard to matters she reasonably believed to
constitute bank fraud, wire fraud and fraud on investors."
(Docket Entry # 4, ¶ 40). SOX is designed to protect employees
from the very same set of actions that Rock presently invokes in
the wrongful termination claim. Her reporting of the "suspected
violations of safety standards" that she believed "present a
threat to the safety of the population at large," <u>Acher v.
Fujitsu Network Communications, Inc.</u>, 354 F.Supp.2d at 29,
arises from the same conduct that prompted her to report the
alleged mail, wire and securities fraud. (Docket Entry # 4, pp.
15-16).

Rock therefore does not have a viable common law claim of
wrongful termination in violation of public policy.
Accordingly, it is not necessary to address the arguments of
preemption and alternative pleading as per Rule 8(d).

III. <u>CPSIA (Count IX)</u>

Lifeline argues that Count IX should be dismissed because the Lifeline devices that are the basis of the CPSIA claim are registered under the Federal Food, Drug, and Cosmetic Act, 15 U.S.C. §§ 360 et seq. ("FDCA"). Consequently, such "devices" are not "consumer products" within the meaning of CPSIA. (Docket Entry # 9, p. 10). Alternatively, Lifeline argues that Rock failed to comply with the procedural requirements of CPSIA by not alleging that she filed a complaint "with the Secretary of Labor within 180 days of the alleged violation" (Docket Entry # 9, pp. 12-13). See 15 U.S.C. § 2087(b).

CPSIA defines the term "consumer product" as any article for sale to a consumer for use in or around a household or school or any article for "the personal use, consumption or enjoyment of a consumer in or around" a household or school. 15 U.S.C. § 2052(H). The term excludes "drugs, devices, or cosmetics (as such terms are defined in sections 201(g), (h), and (i) of the Federal Food, Drug, and Cosmetic Act [21 U.S.C. § 321(g), (h), and (i)])." 15 U.S.C. § 2052(H)(5); see Goldsmith v. Mentor Corp., 913 F.Supp. 56, 63 (D.N.H. 1995). Accordingly, "[M]edical 'devices' covered by the Federal Food, Drug, and Cosmetic Act are specifically not included in the CPSA's definition of consumer products." Kemp v. Pfizer, Inc., 835 F.Supp. 1015, 1024 (E.D.Mich. 1993) (citing 15 U.S.C. § 2052).

Because the Lifeline products at issue are registered devices under the FDCA, Lifeline maintains that they are not consumer products governed by CPSIA and, consequently, are not subject to protection under the statute's whistleblower provision. (Docket Entry # 9). In order to establish that the Lifeline products at issue are regulated by the FDCA, Lifeline attaches to its memorandum (Docket Entry # 9) an affidavit with exhibits (Docket Entry # 11) that purportedly detail the Lifeline products at issue as registered devices on the FDA website. (Docket Entry # 11); see 15 U.S.C. § 2052. Rock concedes that if the Lifeline devices are registered under the FDA, the claim under CPSIA would be improper. (Docket Entry # 13, p. 16). Rock maintains, however, that "the [exhibits] presented on the Motion to Dismiss are inadequate for a determination on this issue" and that Rock "is entitled to engage in discovery on this issue." (Docket Entry # 13, p. 16).

"Ordinarily . . . any consideration of documents not attached to the complaint, or not expressly incorporated therein, is forbidden, unless the proceeding is properly converted into one for summary judgment under Rule 56." Watterson v. Page, 987 F.2d at 3. Lifeline cites In re Fruit Juice Products Mktg. & Sales Practices Litig., 831 F.Supp.2d 507, 509 (D.Mass. 2011), as an example where the court "allow[ed] and [took] judicial notice of information from [the]

27

FDA website and grant[ed] defendant's motion to dismiss based on
it." (Docket Entry # 9, p. 11). The plaintiffs in that case,
however, did not oppose the defendant's request for the court to
take judicial notice. See id. at 509. Here, because Rock
maintains that "the accuracy and authenticity of the attachments
are far from clear" (Docket Entry # 13, p. 16), she implicitly
opposes any request for judicial notice of Lifeline's exhibits.

Rock disputes both the accuracy of the attachments and that
the devices referred to therein are the devices at issue in this
action. Federal Rule of Evidence 201 ("Rule 201") allows a
court to take judicial notice of a fact "at any stage of a
proceeding." F.R.E. 201(d). A court may take judicial notice
of "a fact that is not subject to reasonable dispute because it
. . . can be accurately and readily determined from sources
whose accuracy cannot reasonably be questioned." F.R.E. 201(b).
It is also true that a "Court can take judicial notice and
consider documents posted on a government website." Hadley v.
Chrysler Group LLC, 2014 WL 988962, at *2 (E.D.Mich. March 13,
2014). Where, as here, the information on the website is not
necessarily relevant to the facts, it is inadvisable to assume
that the devices listed in the website are the same as those in
the amended complaint. See Hotel Employees & Restaurant
Employees Union, Local 100 of New York, N.Y. & Vicinity, AFL CIO
v. City of New York Department of Parks & Recreation, 311 F.3d

534, 549 (2nd Cir. 2002) (while "appropriate to take judicial notice of fact that the website makes such a designation, as the authenticity of the site has not been questioned, the fact itself has little relevance with regard to park dedication") (citations omitted).  The amended complaint refers to "transmitting devices" that "provide medical alert warnings" as well as "the Philips Lifeline System," the "Health Watch" System, "Lifeline's 'AutoAlert Help Buttons'" and the "Health Watch equipment" or the "Health Watch units."  (Docket Entry # 4).  At best, the attached exhibits reflect registration of the "Lifeline Personal Response System" or the "Lifeline(R) Personal Response System."  (Docket Entry # 11, Ex. C & D).  The amended complaint does not refer to a "Lifeline Personal Response System."  Accordingly, even taking judicial notice of the website printouts, dismissal of Count IX is improper because the registered devices in the exhibits are not necessarily the devices at issue in this action.

Turning to Lifeline's alternative argument that Rock "fail[ed] to allege compliance with the procedural requirements of the CPSIA whistleblower statute" (Docket Entry # 9, p. 19), section 2087 states, in relevant part:

> A person who believes that he or she has been discharged or otherwise discriminated against by any person in violation of [CPSIA] may, not later than 180 days after the date on which such violation occurs, file (or have any person file on his or her behalf) a complaint with the

> Secretary of Labor alleging such discharge or
> discrimination and identifying the person responsible for
> such act.

15 U.S.C. § 2087(b); see 29 C.F.R. § 1983.103(d).  Lifeline's

reliance on Jallali v. USA Funds, 2012 WL 3291873, at *5

(S.D.Fla. Aug. 13, 2012), is misguided.  The plaintiff's amended

complaint in Jallali "[did] not contain *any* allegation that

Jallali complied with *any* of the procedural requirements of 15

U.S.C. § 2087(b)" nor did the plaintiff address "arguments that

she has failed to exhaust her administrative remedies."  Id.

(emphasis added).  The plaintiff in Jallali "respond[ed] only

that it would have been futile to adhere to the section 2087's

procedural requirements because the litigation had already

commenced at the time the alleged violation had occurred."  Id.

Rock has not indicated that she attempted to bypass any of

section 2087's procedural requirements before bringing forth

this action as the plaintiff did in Jallali.  See id.

Under SOX, which is the first charge that Rock filed with

the DOL, "if the Secretary has not issued a final decision

within 180 days of the filing of the complaint" a claimant may

"[bring] an action at law or equity for de novo review in the

appropriate district court of the United States."  18 U.S.C. §

1514A(b)(1)(B); see 29 C.F.R. § 1980.114(a); Newman v. Metro.

Life Ins. Co., 2013 WL 951779, at *9 (D.Mass. Mar. 8, 2013).

Under CPSIA, which is the second charge that Rock added to the

original charge with the DOL, "If the Secretary has not issued a

final decision within 210 days after the filing of the complaint

. . . the complainant may bring an action at law or equity for

de novo review in the appropriate district court of the United

States."  15 U.S.C. § 2087(b)(4) (italics omitted); see 29

C.F.R. § 1983.114(a)(2).

Here, Rock alleges undertaking the following procedures:

On May 7, 2012 Ms. Rock filed a timely charge of  violation
of the whistleblower provisions of the Sarbanes-Oxley law
with the U.S. Department of Labor, and later added to her
claim with the U.S. Department of Labor a charge of
violation of the whistleblower provisions of the Consumer
Product Safety Improvement Act . . . On March 22, 2013 Ms.
Rock requested that her charges of wrongful termination
with the U.S. Department of Labor be withdrawn, as no
determination on her claims had been made within 180 days
of her filing the claims.  Ms. Rock has exhausted her
administrative remedies and has timely filed suit in this
court.

(Docket Entry # 4, ¶¶ 4-5).

Lifeline terminated Rock on June 14, 2012, purportedly in

violation of the whistleblower protection provisions of CPSIA.

The alleged violation therefore took place in or around June

2012 and, after Rock filed the SOX charge with the DOL on May 7,

2012, she "later added" the CPSIA charge.  See 29 C.F.R. §

1980.103(b) & 29 C.F.R. § 1983.103(b) (under SOX and CPSIA,

"[n]o particular form of complaint is required.  A complaint may

be filed orally or in writing").  Although Rock did not specify

the date she added the CPSIA charge, a reasonable inference can

be drawn that Rock properly filed the CPSIA charge within the requisite 180 day time period.  <u>See</u> 15 U.S.C. § 2087(b).  She withdrew both charges on March 22, 2013.  <u>See</u> 29 C.F.R. § 1980.111(a) & 29 C.F.R. § 1983.111(a) (under SOX and CPSIA, "[a]t any time prior to the filing of objections to the Assistant Secretary's findings and/or preliminary order, a complainant may withdraw his or her complaint").  Again interpreting the record in Rock's favor, a reasonable inference therefore arises that she complied with section 2087(b)(4)'s filing requirements by waiting the requisite 210 days before filing suit in this court.

Lifeline's arguments to dismiss Count IX are unavailing.

CONCLUSION

In accordance with the foregoing discussion, Lifeline System's partial motion to dismiss (Docket Entry # 8) is **ALLOWED** as to Count V and **DENIED** as to Counts I, II and IX.


/s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge