UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DENISE ROCK,
    Plaintiff,


    v.                               CIVIL ACTION NO.
                                         13–11833–MBB

LIFELINE SYSTEMS COMPANY,
    Defendant.


**MEMORANDUM AND ORDER RE:**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
**(DOCKET ENTRY # 54)**

**October 23, 2015**

**BOWLER, U.S.M.J.**

Pending before this court is a motion for summary judgment (Docket Entry # 54) filed by defendant Lifeline Systems Company ("Lifeline"). Plaintiff Denise Rock ("Rock") opposes the motion. (Docket Entry # 66). After conducting a hearing on July 29, 2015, this court took the motion (Docket Entry # 54) under advisement.

PROCEDURAL HISTORY

The amended complaint alleges that Lifeline engaged in gender and age discrimination, wrongful termination of employment and retaliation in violation of state and federal law. (Docket Entry # 4). It sets out the following causes of action: (1) violation of Massachusetts General Laws chapter

151B ("chapter 151B") for discrimination on the basis of gender
(Count I); (2) violation of Title VII of the Civil Rights Act of
1964, 42 U.S.C. § 2000e ("Title VII"), for discrimination on the
basis of gender (Count II); (3) violation of chapter 151B for
discrimination on the basis of age (Count III); (4) violation of
Title VII and the Age Discrimination in Employment Act ("ADEA"),
29 U.S.C. § 621 et seq., for discrimination on the basis of age
(Count IV); (5) violation of public policy under Massachusetts
common law for wrongful termination of employment (Count V); (6)
violation of the whistleblowing protections of the Sarbanes-
Oxley Act ("SOX"), 18 U.S.C. § 1514A ("section 1514A") (Count
VI); (7) violation of chapter 151B for retaliation (Count VII);
(8) violation of Title VII for retaliation (Count VIII); and (9)
violation of the whistleblowing protections of the Consumer
Product Safety Improvement Act ("CPSIA"), 15 U.S.C. § 2087
("section 2087") (Count IX).[1]   (Docket Entry # 4).

On April 26, 2012, Rock filed a charge of discrimination
with the Massachusetts Commission Against Discrimination
("MCAD") and the U.S. Equal Employment Opportunity Commission
("EEOC") against Lifeline alleging discrimination on the basis
of age and sex.  (Docket Entry # 4, ¶ 29).  Lifeline received

---

[1]  The Consumer Product Safety Act, 15 U.S.C. §§ 2051 et seq.,
"has been extensively amended and is now cited as the Consumer
Product Safety Improvement Act of 2008."  In Re: Yamaha Motor
Corp. Rhino ATV Products Liability Litigation, 2010 WL 4007219,
at *1 (W.D.Ky. Oct. 13, 2010).

the charge around the first week of May 2012.  (Docket Entry #
4, ¶ 29).  On May 7, 2012, Rock filed a charge with the U.S
Department of Labor ("DOL") alleging a violation of the
whistleblower protections of SOX.  (Docket Entry # 4, ¶ 4).
Rock "later added . . . a charge of violation of the
whistleblower provisions of [CPSIA]."  (Docket Entry # 4, ¶ 4).

     On June 14, 2012, Lifeline terminated Rock's employment.
(Docket Entry # 4, ¶ 29).  On December 14, 2012, Rock filed a
second charge of discrimination with the MCAD and the EEOC
alleging discrimination on the basis of age, sex and
retaliation.   (Docket Entry # 4, ¶ 4).  On March 22, 2013,
Rock requested to withdraw the charges of wrongful termination
with the DOL because no determination on the claims had been
made within 180 days of filing her claims.  (Docket Entry # 4,
¶ 5).  On May 9, 2013, the EEOC issued a right to sue letter.
(Docket Entry # 4, ¶ 5).

     Lifeline filed a partial motion to dismiss counts I, II, V
and IX.  (Docket Entry # 8).  This court allowed the motion only
to the extent of dismissing Count V.  (Docket Entry # 18).
Lifeline moves for summary judgment on the remaining counts.
(Docket Entry # 54).  Rock opposes the motion and contends that
genuine issues of material fact preclude summary judgment.
(Docket Entry # 66).

<u>STANDARD OF REVIEW</u>

Summary judgment is designed "'to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'"  Dávila v. Corporación De Puerto Rico Para La Difusión Pública, 498 F.3d 9, 12 (1st Cir. 2007) (citations omitted).  Summary judgment shall be granted if the moving party establishes that "there is no genuine dispute as to any material fact."  Fed.R.Civ.P. 56(a).  "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party."  American Steel Erectors, Inc. v. Local Union No. 7, International Association of Bridge, Structural, Ornamental & Reinforcing Iron Workers, 536 F.3d 68, 75 (1st Cir. 2008).  "A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law."  Id.

Facts are viewed in favor of the non-movant, in this case, Rock.  See Noonan v. Staples, Inc., 556 F.3d 20, 23 (1st Cir. 2009).  When "the nonmovant has the burden of proof and the evidence on one or more of the critical issues in the case is not significantly probative, summary judgment may be granted." Dávila v. Corporación De Puerto Rico La Difusión Pública, 498 F.3d at 12 (internal quotation marks, citation and ellipses omitted).  When the moving party, in this case Lifeline, has made an initial showing that no genuine issue of material fact exists, the nonmovant, Rock, must "produce specific facts, in

suitable evidentiary form, to establish the presence of a trialworthy issue." Clifford v. Barnhart, 449 F.3d 276, 280 (1st Cir. 2006) (internal quotation marks and citation omitted). "[A] conglomeration of 'conclusory allegations, improbably inferences, and unsupported speculation is insufficient to discharge the nonmovant's burden." DePoutot v. Raffaelly, 424 F.3d 112, 117 (1st Cir. 2005) (quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

In accordance with LR 56.1, the moving party must submit a "concise statement of the material facts of record as to which the moving party contends there is no genuine issue to be tried." The party opposing the motion must include a statement of material facts to which it asserts "there exists a genuine issue to be tried." LR 56.1. Unless the nonmovant controverts the statements made by the moving party, the facts "will be deemed for purposes of the motion to be admitted" and comprise part of the summary judgment record. See Cochran v. Quest Software, Inc., 328 F.3d 1, 12 (1st Cir. 2003). In reviewing a motion for summary judgment, a court may examine "all of the record materials on file including the pleadings, depositions, and affidavits." Ahmed v. Johnson, 752 F.3d 490, 495 (1st Cir. 2014); see Fed.R.Civ.P. 56(c)(3). Plaintiff's affidavit submitted to the MCAD and filed as part of the summary judgment record is therefore appropriately considered. Fed.R.Civ.P.

56(c)(3); see, e.g., Huckabay v. Moore, 142 F.3d 233, 240 (5th Cir. 1998).

FACTUAL BACKGROUND

Up until her termination, Rock was employed at Lifeline for 12 years as a sales person or, to use the formal title, an "'account representative.'"  (Docket Entry # 68-2, p. 3). Lifeline, "also known as Philips Lifeline or Philips," is a subsidiary company of Royal Philips Electronics ("Royal").[2] (Docket Entry # 68-2, p. 3).  Rock initially worked at Lifeline Systems, Inc. beginning in 2000.  (Docket Entry # 68-2, p. 3). Thereafter, she also worked at Philips Lifeline, which subsequently changed its name to Lifeline Systems, Inc., i.e., Lifeline.  (Docket Entry # 68-2, p. 3).

Royal acquired Lifeline in 2006 and Health Watch Holdings, Inc. ("Health Watch") in 2007.  (Docket Entry # 68-4, p. 3) (Docket Entry # 56-1, pp. 6-7).  Lifeline and Health Watch have, at various times, "manufactured and sold devices" that can provide "medical alert warnings from a customer's residence to a central location from which assistance could be provided." (Docket Entry # 4, ¶ 12, 2nd sent.) (Docket Entry # 19 ¶ 12, 1st

---

[2]  In a LR. 7.3 corporate disclosure statement, Lifeline represents that it "is an indirect, wholly owned subsidiary of Koninklijke Philips, N.V."  (Docket Entry # 10).  Any discrepancy in the ownership of Lifeline and the names of its various predecessor companies is not material to the decision on the summary judgment motion.

sent.).  Certain devices have a button which, when pushed,
transmits a signal to a local transmitter, which, in turn,
transmits "a signal to a trained response associate."  (Docket
Entry # 4, ¶ 12, 3rd sent.) (Docket Entry # 19, ¶ 12, 1st
sent.).

 Rock was born in 1957 and was one of the oldest
salespeople in her department.  (Docket Entry # 68-2, pp. 3-7).
Throughout her employment, Rock was "consistently in the top 4
or 5 performers in [her] department in terms of sales and
revenue results."  (Docket Entry # 68-2, p. 3).

Despite occasional changes in title, Rock essentially held
the same position with almost the same responsibilities until
the end of her employment at Lifeline in June 2012.  (Docket
Entry # 56-1, p. 9).  Some of these responsibilities included
convincing the account holders assigned to her to purchase new
equipment and identifying new referral sources in order to
increase revenue.  (Docket Entry # 56-1, pp. 15-17).  Rock was
responsible for achieving daily and monthly sales call averages,
maintaining appropriately frequent contact with key customer
personnel and forecasting potential sales referrals in her
territory.  (Docket Entry # 56-1, p. 27).

After Health Watch was acquired, Rock was partnered with a
Health Watch Transition Specialist, Marianne Christman
("Christman").  (Docket Entry # 68-1, p. 4).  Rock claims

Christman told her that there was a faulty design in the Health
Watch Equipment that caused the units to catch fire.  According
to Rock, Christman said that one of her Health Watch subscribers
had died in a fire.[3]  (Docket Entry # 68-1, p. 4).  In total, six
of Christman's subscribers had died in fires.  (Docket Entry #
68-1, p. 4).  She informed Rock that she reported the matter to
Health Watch on many occasions but it was seemingly ignored.[4]
(Docket Entry # 68-1, p. 5).  Christman denies that this
conversation ever happened between her and Rock.  (Docket Entry
# 56-1, p. 84).

On September 25, 2007, Rock sent an email to a Lifeline
attorney, Paul Laurino, Esq. ("Attorney Laurino"), a member of
the Health Watch Transition Team.  The email reported the
conversation Rock had with Christman regarding the fires.
(Docket Entry # 68-1, p. 5).  Rock forwarded the email to,
Kenneth Reinhard, Esq. ("Attorney Reinhard"), another Lifeline
attorney.  Rock also spoke with Gerald Whitcomb, Esq. ("Attorney
Whitcomb"), a Lifeline attorney about the matter.  (Docket Entry
# 68-1, p. 5).

On November 14, 2007, Terry Sweeney, Sr., the senior vice
president corporate quality and regulatory affairs for Phillips

---

[3]  Rock's statement of Christman's statements are not considered
for the truth of the matter asserted.  Rather, this court
considers the statements to show notice by Health Watch of the
issue.
[4]  See footnote three.

Medical Systems, informed Rock that Bob Pettis ("Pettis") and
David Jones ("Jones") would be contacting her to assist with the
investigation.  (Docket Entry # 68-1, p. 5).  Eventually a
conference call occurred involving Rock, Jones, Pettis and
Janina Sadlowski ("Sadloski").  (Docket Entry # 68-1, p. 5).
During this call, Rock repeated the information that she had
been told by Christman.[5]  (Docket Entry # 68-1, p. 5).

Rock's supervisor during the period from 2008 to 2012 was
Laine Lovell ("Lovell"), a regional sales manager.  (Docket
Entry # 56-1, p. 10).  Lovell met one-on-one with the territory
representatives in her group, including Rock, to provide
coaching, advice and encouragement.  (Docket Entry # 56-2, p.
6).  As a supervisor, Lovell's duties included reviewing weekly
sales forecasts, sales numbers and job skill metrics for the
purpose of monitoring and evaluating performance.  (Docket Entry
# 56-2, p. 27).

In 2008, Rock received a low performance evaluation that
was critical of her "'communications and effective working
relations.'"  (Docket Entry # 68-2, p. 4).  Lovell stated that
several of Rock's skills, including time management and
communication, fell below the company's expectations.  (Docket
Entry # 56-1, p. 30).  While Rock still received a 4% bonus that
year, it was not the higher 12% to 18% bonus that it could have

---

[5]  See footnote three.

been.  (Docket Entry # 68-2, p. 4).

In January 2009, Rock was involved in reporting deaths from strangulation by Lifeline neck-cords.  (Docket Entry # 68-1, pp. 6-7).  This was the only time Rock had reported on a neck-cord issue and she did not make any more reports on it after October 2009.  (Docket Entry # 56-1, p. 79).

On October 1, 2009, one of Rock's coworkers, Larry Storace ("Storace"), told her that he had received a report about a subscriber who reported that the subscriber's Lifeline Communicator Unit had caught fire while plugged into an electrical outlet.[6]  (Docket Entry # 68-1, p. 6).  The burned unit was later returned to the company and submitted for testing.  (Docket Entry # 68-1, p. 6).  Rock again contacted Attorney Laurino to report what she had learned from Storace.  (Docket Entry # 68-1, p. 6).  Attorney Laurino assured Rock that the matter was being investigated.  (Docket Entry # 68-1, p. 6).

On October 14, 2009, Rock received an email from Lovell transmitting an "Action Plan" discussing "improvement areas." (Docket Entry # 68-1, p. 7).  Around the same time, Lovell met with Rock and addressed her in an angry tone regarding a sales call Rock had made.  (Docket Entry # 68-1, p. 7).  According to Rock, Lovell's attitude and demeanor toward her had drastically

---

[6]  The statements are not considered for the truth of the matter asserted, but rather, to show the basis for Rock's complaints and therefore notice to the company of the report.

changed since she had raised the concerns over the Lifeline
units catching fire.  (Docket Entry # 68-1, p. 7).  On October
16, 2009, Rock received a telephone call from Attorney Laurino
asking her about interactions with a referral source.  (Docket
Entry # 68-1, p. 7).  The referral source was being investigated
for Medicare/Medicaid fraud.  (Docket Entry # 68-1, p. 7).

On December 17, 2009, Rock received an email from a
Lifeline Program Manager reporting that two of the Program
Manager's "subscribers had perished when their house burned
down."[7]  (Docket Entry # 68-1, p. 8).  The Program Manager
reported that she would not be able to return the rented units
to Lifeline.  (Docket Entry # 68-1, p. 8).  Rock emailed Lovell
to ask how to go about getting the equipment back so it could be
tested.  (Docket # 68-1, p. 8).  Lovell responded telling Rock
to "'stop by'" her office.  (Docket Entry # 68-1, p. 8).
According to Rock, when she went to Lovell's office she was told
not to worry about the equipment and that "'lots of people die
in fires.'"[8]  (Docket Entry # 68-1, p. 8).

After the discussion with Lovell that day, Rock telephoned
"customer service and learned that the couple" that died in the

---

[7]  Rock's recitation of Lovell's comment is not considered for
the truth of the matter asserted.  Rather, it is considered to
show Lovell's state of mind, notice and the nature of the
company's response to Rock's concern.

[8]  Rock's recitation of Lovell's comment is not considered for
the truth of the matter asserted, i.e., that people die in
fires.

fire "did not use their buttons to call for help."  (Docket
Entry # 68-1, p. 8).  Fearful that the units themselves may have
been the cause of the fire, Rock reported her concern to
Attorney Whitcomb in an email.  (Docket Entry # 68-1, p. 8).  He
responded that she forward all of her concerns to Attorney
Laurino.  Rock could not reach Attorney Laurino so she instead
telephoned Ellen Berezin ("Berezin") in the human resources
department.  (Docket Entry # 68-1, p. 8).  In an email, Berezin
requested additional information and wrote that Rock should
contact Jones immediately.  (Docket Entry # 68-1, p. 8).

After December 17, 2009, Rock met with Jones and another
individual from the quality and regulatory team.  (Docket Entry
# 68-1, p. 8).  Upon Rock relaying her latest concerns, Jones
responded that he did not think it would be a good idea to
retrieve the unit from the most recent fire.[9]  (Docket Entry #
68-1, p. 9).  According to Rock, Jones said that when another
company, Firestone Tire, had a problem, people began to blame
Firestone for "all sorts of accidents."[10]  (Docket Entry # 68-1,
p. 9).

In 2010, Rock out-performed her sales region and the
company but was denied a merit increase.  (Docket Entry # 68-2,

---

[9]  Rock's recitation of Jones' statement is not considered for
the truth of the matter asserted.  Rather, it is considered for
the state of mind of Jones and the nature of the company's
response to Rock's concern.
[10] See the previous footnote.

p. 8).  Almost every other member of Rock's sales team received
a merit increase.  (Docket Entry # 68-2, p. 5).  On April 13,
2011, Rock wrote to Lovell asking why she had not received a
merit increase in light of her "exceptional sales performance."
(Docket Entry # 68-2, p. 8).  Rock was never given an
explanation as to why she was not given a merit increase.
(Docket Entry # 68-2, p. 8).

     In May 2011, Rock wrote to Frank Okraskinski
("Okraskinski") in Lifeline's human resources department and
complained that her skills were being discredited with an unfair
assessment.  (Docket Entry # 68-2, p. 8).  Rock told
Okranskinski she believed she was being retaliated against for
reporting her concerns about equipment issues and asked to have
an independent evaluation of her skills.  (Docket Entry # 68-2,
p. 8).

     By the middle of 2011, Rock "was meeting [her] goals" and
she eventually exceeded her year end revenue goal.  (Docket
Entry # 68-2, p. 6).  Rock was ranked fifth out of 19 corporate
account representatives and eighth out of 36 for the entire
sales group.  (Docket Entry # 68-2, p. 8).  She had a similar
ranking for the entire six years she was in the department.
(Docket Entry # 68-2, p. 8).

     In October 2011, Lifeline management began to implement a
new strategy for sales.  (Docket Entry # 68-2, p. 9).  Half of

the sales force was eliminated and the remaining sales force was directed to focus on "[r]evenue." (Docket Entry # 68-2, p. 9). Rock was able to eliminate her revenue gap and achieved 137% of her equipment goal. (Docket Entry # 68-2, pp. 9-10). Rock finished 2011 at 102% of her total revenue goal. (Docket Entry # 68-2, p. 9-10).

In late 2011, Rob Wolf ("Wolf") became the area vice president of sales for corporate accounts at Lifeline. Rock knew that Wolf was a friend of several employees "involved with the Health Watch transition" and that those friends had been "aware of [her] reporting." (Docket Entry # 68-2, p. 5).

In January 2012, Rock was "responsible for 30% of the Company's equipment revenue." (Docket Entry # 68-2, p. 6). That same month, Rock received low evaluations and was placed on a two month performance improvement plan ("PIP"). (Docket Entry # 68-2, p. 6). Lifeline management used Rock's low call volume statistics to justify the low evaluations. (Docket # 68-2, p. 10). Rock informed Orkasinski in human resources that the plan "was completely unattainable." (Docket Entry # 68-3, p. 6). Rock also told Lovell that she believed she was being treated differently than younger employees. (Docket Entry # 68-3, p. 10).

During her employment, Rock observed that "[y]ounger employees, male employees, and in particular younger female

employees" at Lifeline were "held to a less strict performance standard" than she was.  (Docket Entry # 68-2, p. 5).  Whereas Rock's PIP criticized her "'call volume,'" younger as well as male employees were not criticized for their lower call volume statistics.  (Docket Entry # 68-2, p. 6).  Rock observed that younger coworkers in her department were not disciplined or criticized for socialization and inattentiveness.  (Docket Entry # 68-2, p. 7).  She also noticed that a number of younger employees "surfed the internet" and made few work calls during the day yet were not criticized or disciplined for such conduct.  (Docket Entry # 68-2, p. 7).

Two younger employees that Rock identified as treated better than her were Charlene Avalos ("Avalos") and Jacob Puccio ("Puccio").  (Docket Entry # 68-3, pp. 4, 5, 8). According to Rock, Avalos had a lower call volume.  (Docket Entry # 68-3, pp. 5, 8).  Rock also stated that Puccio was required to make fewer calls and would pretend he was making customer calls when that was not the case.  (Docket Entry # 68-3, p. 9).  Rock did not know that Lovell had issued warnings to both Avalos and Puccio and that both of them had left her group or resigned voluntarily.  (Docket Entry # 56-2, pp. 69-80).

In 2011, all but two out of 36 representatives in the entire sales organization failed to meet their subscriber growth goals.  (Docket Entry # 68-2, p. 9).  Two sales

representatives, Ivemarie Cintron and Seth Evans, failed to meet their subscriber growth goals reaching -131.5% of goal and 41.8% of goal, respectively.  (Docket Entry # 68-2, p. 9).  In spite of their failure, both representatives received the "Phillips Lifeline President's Achievement Award."  (Docket Entry # 68-2, p. 9).  Recipients of the award were required to achieve at least 103% of their subscriber goal.  (Docket Entry # 68-2, p. 9).

Rock also maintained that the call volume quota was not evenly applied due to inconsistencies in how individual sales representatives logged calls into the system.  (Docket Entry # 68-2, p. 10).  Specifically, there was an inconsistency on how a "'call'" or "'attempted call'" would be logged into the system, thereby creating a possibility to "game the system." (Docket Entry # 68-2, p. 10).  Lifeline management did not enforce the rules and there was no written or documented proof for logging calls.  (Docket Entry # 68-2, p. 10).

On March 12, 2012, Rock was given a final warning letter regarding unsatisfactory job performance.  (Docket Entry # 56-7, pp. 8-13).  In response, Rock wrote on the face of the letter:

> I would like to make you aware that my attorney Mitchell Notis has explained in detail, in a letter dated 3/4/2012 to Steve Rusckowski and Frans Von Houten that my performance has been unfairly evaluated and I am being retaliated against for [sic] Whistle Blowing [sic]

regarding Phillips Lifeline product defects.
(Docket # 56-7, p. 13).

From April through June 2012, Rock reported safety issues
with Lifeline auto alert buttons. (Docket Entry # 68-3, p. 11).
During this time, Rock had become aware that there were units
for testing that were being destroyed. (Docket Entry # 68-3, p.
14). Rock also discovered that in some cases, the receipt of
the defective units was being denied by Lifeline. (Docket Entry
# 68-3, p. 14). On June 14, 2012, Rock sent an email to a
Lifeline quality manager, Janina Sadlowski, saying that she
"needed to get some answers about why every piece of equipment
that was sent in for engineering evaluation the auto alert
button in the units were lost." (Docket Entry # 68-3, p. 12).

On June 14, 2012, Rock was informed that her employment was
terminated. (Docket Entry # 68-3, p. 12). Lifeline hired a
female in her thirties to replace Rock. (Docket Entry # 68-4,
pp. 9-10). Rock's territory was given to a male employee in his
forties who had been with the company for several years.
(Docket Entry # 68-4, p. 10).

Lovell made the decision to terminate Rock but this
decision had to be approved by both the human resources
department and the legal department. (Docket Entry # 68-4, p.
15) (Docket Entry # 68-5, p. 10). The three human resources
individuals involved in making the decision to terminate Rock

were Okrasinski, Berezin and Molly Dorman ("Dorman").[11]  (Docket Entry # 68-4, p. 13).

Lovell testified that she had no knowledge of Rock's claims about Lifeline products catching fire or that Rock had reported issues with the auto alert help buttons prior to this lawsuit. (Docket Entry # 68-4, p. 6).  Lovell had no recollection of the email from Rock in December 2009 regarding two subscribers perishing in a fire.  (Docket Entry # 68-4, p. 7).  Lovell, however, was aware that Rock had raised issues of "defective Phillips Lifeline equipment."  (Docket Entry # 68-4, pp. 7-8). It is also a reasonable inference that Lovell would have received Rock's final written warning with Rock's notations on it.  (Docket Entry # 68-4, pp. 7-8) (Docket Entry # 56-7, p. 13).  Lovell also testified that she did not become aware of Rock's discrimination charge filed with the MCAD until after Rock's termination.  (Docket Entry # 68-4, p. 11).  During meetings to discuss Rock's termination, Okrasinki and Lovell agree that Rock's filed charge of discrimination was never discussed.  (Docket Entry # 68-4, p. 14).

Before the termination of Rock's employment, Okrasinski and Berezin were aware that Rock had filed a complaint against Lifeline with the United States Occupational Safety and Health

---

[11]   The parties dispute the level of involvement, if any, that the above human resources individuals had in Lovell's decision.

Administration ("OSHA").  (Docket Entry # 68-6, p. 5).
Okrasinki also knew that Rock had filed a charge of
discrimination against Lifeline before the company terminated
her employment.  (Docket Entry # 68-6, p.3).  In addition,
Okrasinski was aware of Rock's belief she was being retaliated
against for whistleblowing.  (Docket Entry # 68-5, p. 6).
Okrasinki also informed Berezin, Dorman and "legal" about Rock's
statements concerning defective Lifeline products.  (Docket
Entry # 68-5, p. 5).

DISCUSSION

I.  <u>Gender Discrimination (Counts I and II)</u>

Lifeline argues that counts I and II are subject to summary
judgment because Rock cannot point to any evidence that Lifeline
discriminated against her on the basis of sex.  Lifeline further
argues that Rock fails to set out a prima facie case of gender
discrimination.  Specifically, with respect to the second
element, Lifeline contends that Rock was failing to meet its
expectations.  As to the fourth element, Lifeline contends that
Rock has no proof that an individual outside Rock's protected
class received favorable treatment or was hired in her place.
(Docket Entry # 55).  Rock submits that the prima facie case for
gender discrimination does not require a showing of comparator
evidence and that a demonstration of discriminatory animus and
causation by "proof of pretext" is sufficient to survive

19

dismissal.  (Docket Entry # 66).

Lifeline and Rock disagree on the appropriate prima facie showing for gender discrimination under chapter 151B and Title VII.  (Docket Entry ## 55, 66).  Where, as here, there is no direct evidence of gender discrimination, the paradigm set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–04 (1973), applies.  Under the burden-shifting framework of McDonnell Douglas, the plaintiff employee bears the initial burden of showing a prima facie case for discrimination by a preponderance of the evidence.  The burden of production then shifts to the defendant employer "'to articulate some legitimate, nondiscriminatory reason'" for its adverse employment action against the plaintiff.  See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 248 (1981) (internal citation omitted).  If the defendant employer satifies this burden of production, the burden rests on the plaintiff employee to "submit evidence that the defendant's articulated reason for the termination was not the real one, but a pretext, or cover-up, for the discriminatory motive underlying the plaintiff's termination."  Knight v. Avon Products, Inc., 780 N.E.2d 1255, 1262, n.4 (Mass. 2003); see Loeb v. Textron, Inc., 600 F.2d 1003, 1012 (1st Cir. 1979).  "'The analysis of a gender discrimination claim is essentially the same under the State and Federal statutes.'"  Beal v. Board of Selectmen of Hingham, 646

N.E.2d 131, 138 n.5 (Mass. 1995) (internal brackets and citation omitted).

As set out in Kosereis, "a plaintiff establishes a prima facie case by showing that (1) [she] is a member of a protected class; (2) [she] was qualified for the job; (3) the employer took an adverse employment action against [her]; and (4) the position remained open or was filled by a person with similar qualifications." Kosereis v. Rhode Island, 331 F.3d 207, 212-13 (1st Cir. 2003); accord García v. Bristol-Myers Squibb Co., 535 F.3d 23, 31 n.2 (1st Cir. 2008). "The last two elements may 'vary according to the nature of the plaintiff's claim.'" Cham v. Station Operators, Inc., 685 F.3d 87, 93 (1st Cir. 2012) (internal brackets and citation omitted); Abramian v. President & Fellows of Harvard College, 731 N.E.2d 1075, 1084 (Mass. 2000) (elements of chapter 151B prima facie case "'may vary depending on the specific facts of a case'") (internal citation omitted).

A slightly different formulation of the fourth element in a prima facie gender discrimination case resulting in termination is that the "employer sought a replacement with similar qualifications." Beal v. Board of Selectmen of Hingham, 646 N.E.2d at 138; accord White v. University of Massachusetts at Boston, 574 N.E.2d 356, 358 (Mass. 1991) (stating fourth element in gender discrimination wrongful termination case as "employer sought a replacement with similar qualifications"); Gómez-

González v. Rural Opportunities, Inc., 626 F.3d 654, 662 (1st Cir. 2010) (fourth element of "prima facie case of gender-based discriminatory discharge under Title VII" is that "employer sought someone of roughly equivalent qualifications to perform substantially the same work").

In reduction in force cases, however, "the fourth prong is unworkable because the plaintiff's position no longer exists." Lewis v. City of Boston, 321 F.3d 207, 214 n.6 (1st Cir. 2003). The reduction in force cases cited and relied upon by Rock are therefore distinguishable.

The prima facie framework is nonetheless "not a mechanical exercise." Sanchez v. Puerto Rico Oil Co., 37 F.3d 712, 719 (1st Cir. 1994). Furthermore, in a 1990 First Circuit case, the court noted that, "we have never held that the fourth element of a prima facie discharge case can be fulfilled *only* if the complainant shows that she was replaced by someone outside the protected group. Indeed, we have said precisely the opposite." Cumpiano v. Banco Santander Puerto Rico, 902 F.2d 148, 155 (1st Cir. 1990) (gender discrimination brought by former female employee) (emphasis added). Cumpiano thus held "that, in a case where an employee claims to have been discharged in violation of Title VII, she can make out the fourth element of her prima facie case without proving that her job was filled by a person not possessing the protected attribute" and that "a complainant

can satisfy the fourth prong of her prima case simply by showing that . . . the employer had a continued need for 'someone to perform the same work after the complainant left.'"   Id. (internal brackets and citation omitted); see Miles v. Dell, Inc., 429 F.3d 480, 486 n.3 (4th Cir. 2005) (collecting case law); Pivirotto v. Innovative Systems, Inc., 191 F.3d 344, 353 (3rd Cir. 1999)(noting "that seven of the eight federal courts of appeals to have addressed it have held that a plaintiff need not prove, as part of her prima facie case, that she was replaced by someone outside of the relevant class"); see Caesar v. Shinseki, 887 F.Supp.2d 289, 303 (D.Mass. 2012) (dicta noting that while "'attributes of a successor employee may have evidentiary force in a particular case,' plaintiff is certainly not required to prove 'that her job was filled by a person not possessing the protected attribute'") (internal citation omitted); Douglas v. J.C. Penney Co., Inc., 422 F.Supp.2d 260, 273 n.8 (D.Mass. 2006) (fact that plaintiff, a male, "was replaced with a male has 'evidentiary force,' but does not defeat his prima facie case").

In the case at bar, Lifeline hired another female to replace Rock as a sales representative.  Lifeline however gave Rock's territory to a male employee who, viewing the record in Rock's favor, assumed the duties of Rock's position.  Giving Rock's territory to a male employee coupled with an adequate showing that Lifeline had a continued need "for 'someone to

perform the same work after [the complainant] left,'" <u>Cumpiano v. Banco Santander Puerto Rico</u>, 902 F.2d at 155 (internal citation omitted), as shown by the fact that it hired a replacement, provides an adequate showing to satisfy the relatively easy burden of the prima facie case.  See <u>Kosereis v. Rhode Island</u>, 331 F.3d at 213 (prima facie showing "is not onerous and is easily made") (omitting citations and internal quotation marks).  Lifeline's argument seeking summary judgment on the basis of Rock's failure to meet the fourth element of a prima facie case is therefore unavailing.

Lifeline argues that Rock cannot state a claim of gender discrimination because she alleges that 'all' employees were treated better than she was, not just male employees.  (Docket Entry # 55, p. 15).  It is true that Rock states that Lifeline held younger female employees to a less strict performance standard.  (Docket Entry # 68-2, p. 5).  Rock also alleges, however, that Lifeline held male employees to a less strict performance standard.  (Docket Entry # 68-2, p. 5).  Lifeline's argument is therefore not convincing.

Lifeline next contends that Rock cannot prove that male employees with performance issues similar to hers were treated better.  (Docket # 55, pp. 14-15).  Rock is not necessarily required to offer and analyze comparator evidence as part of the prima facie case.  See <u>Cham v. Station Operators, Inc.</u>, 685 F.3d

at 94 n.4 ("'time to consider comparative evidence in a disparate treatment case is at the third step of the burden-shifting ritual . . .,' as opposed to as part of a plaintiff's prima facie case") (internal citations omitted); Conward v. Cambridge School Committee, 171 F.3d 12, 19 (1st Cir. 1999).

In sum, with respect to Lifeline's arguments, Rock is able to establish the components of a prima facie case for gender discrimination.  Summary judgment is therefore not warranted as to counts I and II.

## II. Age Discrimination (Counts III and IV)

Lifeline next argues that counts III and IV are subject to summary judgment because Rock cannot point to sufficient evidence that Lifeline discriminated against her on the basis of age.  (Docket Entry # 55).  Lifeline further argues that Rock fails to establish a prima facie case of age discrimination. (Docket Entry # 55).

As with the sex discrimination claims, Rock proffers no direct evidence of age discrimination.  See generally Meléndez-Arroyo v. Cutler-Hammer De Puerto Rico Co., Inc., 273 F.3d 30, 35 (1st Cir. 2001) (defining direct evidence as "'statements by a decision maker that directly reflect the alleged animus and bear squarely on the contested employment decision'") (internal citation omitted).  Nor does she allege a disparate impact theory based on a facially neutral practice.  See generally

Hazen Paper Co. v. Biggins, 507 U.S. 604, 609 (1993) (explaining distinction between disparate treatment and impact theories). Accordingly, where, as here, "direct evidence is lacking, the plaintiff's ADEA claim is governed by the familiar McDonnell Douglas burden-shifting framework." Cardona Jimenez v. Bancomercio De Puerto Rico, 174 F.3d 36, 40 (1st Cir. 1999). Under this framework, the plaintiff must first satisfy "the low standard of showing prima facie discrimination." Zapata-Matos v. Reckitt & Colman, Inc., 277 F.3d 40, 44 (1st Cir. 2002).

An ADEA plaintiff suing his employer "for termination of employment must adduce evidence which, if believed, suffices to prove four facts: (1) that he was at least forty years old when he and his employer parted company; (2) that his job performance met the employer's legitimate expectations; (3) that he lost his position through an adverse employment action attributable to the employer (typically, a firing); and (4) that the employer had a continuing need for the services that he had been rendering." Suarez v. Pueblo International, Inc., 229 F.3d 49, 53 (1st Cir. 2000); accord Gonzalez v. El Dia, Inc., 304 F.3d 63, 68 n.5 (1st Cir. 2002) (citing Suarez and setting forth same four requirements in ADEA wrongful termination case); Baralt v. Nationwide Mutual Insurance Co., 251 F.3d 10, 16 n.8, 17 (1st Cir. 2001) (giving same factors and identifying fourth factor as requiring showing that "the employer had a continuing need for

the same services he had been performing") (internal citation omitted).  The First Circuit also describes the fourth factor as requiring a showing that the plaintiff "'was replaced by a person with roughly equivalent job qualifications.'"  LeBlanc v. Great American Insurance Co., 6 F.3d 836, 842 (1st Cir. 1993) (ADEA wrongful termination case) (internal citation omitted); accord Mulero-Rodríguez v. Ponte, Inc., 98 F.3d 670, 673 (1st Cir. 1996) (ADEA wrongful termination case wherein court described fourth factor as requiring a showing that the plaintiff "was replaced by another with similar skills and qualifications"); Cardona Jimenez v. Bancomercio De Puerto Rico, 174 F.3d at 41 (giving same factors in ADEA wrongful termination case and identifying fourth factor as requiring showing that "the employer had a continuing need for the same services, and they subsequently were performed by one with the same or similar qualifications as the plaintiff").

Rock was at least 50 years old at the time of her termination and therefore met the first and third prongs of a prima facie showing.  Lifeline challenges Rock's showing on the second and fourth prongs.

Turning to the second prong, Rock's record, viewed in her favor, evidences that she was performing her job in a proficient manner.  In 2010, Rock out-performed her sales region and the company, but was denied a merit increase.

(Docket Entry # 68-2, p. 8).  By 2011, Rock "was meeting [her] goals" and she eventually exceeded her year end revenue goal. (Docket Entry # 68-2, p. 6).  Rock was ranked fifth out of 19 corporate account representatives and eighth out of 36 for the entire sales group.  (Docket Entry # 68-2, p. 8).  She had a similar ranking for the entire six years she was in the department.  (Docket Entry # 68-2, p. 8).  When Lifeline management began to implement a new strategy for sales in 2011, Rock was able to "'close'" her revenue gap and achieve 137% of her equipment goal.  (Docket Entry # 68-2, p. 10).  In 2011, Rock finished the year at 102% of her total revenue goal. (Docket Entry # 68-2, p. 10).  In January 2012, Rock was responsible for 30% of the Company's equipment revenue. (Docket Entry # 68-2, p. 6).

In regards to the fourth prong, Lifeline hired a younger employee to replace Rock as a sales representative and gave her territory to a younger employee who, viewing the record in Rock's favor, assumed the duties of Rock's position.  Giving Rock's territory to a younger employee coupled with an adequate showing that Lifeline had a continued need "for 'someone to perform the same work after [the complainant] left,'" <u>Cumpiano v. Banco Santander Puerto Rico</u>, 902 F.2d at 155 (internal citation omitted), as shown by the fact that it hired a replacement, provides an adequate showing to satisfy the

relatively easy burden of the prima facie showing on the fourth prong.  See Kosereis v. Rhode Island, 331 F.3d at 213 (prima facie showing "is not onerous and is easily made") (omitting internal quotation marks and citation).  Lifeline's arguments based on Rock's failure to meet the second and fourth elements of a prima facie case are therefore unavailing.

At this stage, a rebuttable presumption arises that Lifeline engaged in unlawful discrimination.  Gonzalez v. El Dia, Inc., 304 F.3d at 68-69 ("prima-facie-case showing generates a rebuttable presumption that the defendant-employer violated the ADEA"); accord Domínguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 430 (1st Cir. 2000).  The burden of production, as distinguished from the burden of proof, see id., therefore, shifts to the defendant employer "to articulate a legitimate, nondiscriminatory basis for its adverse employment action."  Gonzalez v. El Dia, Inc., 304 F.3d at 69.  More specifically, the employer "need only *articulate* a legitimate, non-discriminatory reason for the termination to shift the burden back to the plaintiff to prove by a preponderance of the evidence that the employer's reason was a pretext and that the real reason was age-based animus."  Baralt v. Nationwide Mutual Insurance Co., 251 F.3d at 16 n.8 (internal citation omitted).

In order to show a legitimate and nondiscriminatory reason for terminating Rock, Lifeline relies on the internal

evaluations made by her supervisors.  The evaluations provide sufficient evidence of a non-discriminatory reason that Rock's deficient performance was the reason for the decision to terminate Rock's employment.

With Lifeline having met its burden of production, "the presumption generated by the employee's prima facie case disappears."  LeBlanc v. Great American Insurance Co., 6 F.3d at 842.  At this final stage, the plaintiff "must adduce sufficient credible evidence that age was a motivating factor in the challenged employment action."  Gonzalez v. El Dia, Inc., 304 F.3d at 69; accord Melendez-Arroyo v. Cutler-Hammer De Rico Co., Inc., 273 F.3d at 35-36 ("the question is whether the evidence, taken as a whole, creates a factual issue as to whether" the adverse action "was motivated by age").  The plaintiff must show that "the nondiscriminatory reason relied upon by [the employer] was pretextual and that the challenged employment action was motivated by an age-based animus."  Vesprini v. Shaw Contract Flooring Services, Inc., 315 F.3d 37, 43 (1st Cir. 2002).  In essence, the plaintiff's burden of production to show that the stated reason was a pretext "'merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination.'"  Domínguez-Cruz v. Suttle Caribe, Inc., 202 F.3d at 430 (internal citation omitted).

Here, Rock's deficient performance evaluations largely

began after she first reported safety issues with the company.[12]
Furthermore, a reasonable finder of fact could readily find that
Rock's performance, as discussed with respect to the second
prong of the prima facie showing, was not deficient even
considering the ratings on the internal evaluations.  Viewing
the record as a whole in Rock's favor, Lifeline's argument that
Rock fails to provide sufficient evidence of unlawful age
discrimination is unavailing.  Summary judgment is therefore not
appropriate as to counts III and IV.

III. SOX Claim (Count VI)

 Lifeline seeks summary judgment on Count VI on the basis
that Rock cannot show she engaged in conduct protected by SOX
and cannot demonstrate the requisite causal connection between
the protected conduct and her termination.  In particular,
Lifeline asserts that Rock "cannot show that she had a
subjective and objectively reasonable belief that the conduct
she was reporting constituted a violation of the laws enumerated
in SOX's anti-retaliation provision."  (Docket Entry # 55, p.
17).  Rock counters that her termination "was accomplished to
prevent shareholders or investors from learning that Lifeline"
or, more specifically, its primary product caused fires

---

[12]  Rock admits that she had been put on a PIP in 2005 but says
it was the result of a negative relationship with her boss at
that time who had threatened her and has since been fired.
(Docket Entry # 56-1, p. 111).

resulting in injuries and deaths to a number of users.

Furthermore, Rock submits that Lifeline attempted "to hide such

significant liabilities [which] amounts to securities fraud."

(Docket Entry # 66, p. 18).

Thus, Lifeline argues that Rock cannot establish a prima

facie case of retaliation under SOX.  Additionally, Lifeline

contends that even if Rock could establish a prima facie case,

the SOX claim still fails because Rock's poor performance was a

legitimate reason for Lifeline to terminate her employment.

The purpose of SOX is to "[protect] 'whistleblower'

employees of publicly-traded companies by prohibiting employers

from retaliating against employees because they provided

information about specified potentially unlawful conduct."  Day

v. Staples, Inc., 555 F.3d 42, 52 (1st Cir. 2009) (internal

citation omitted).  As explained in Day:

> Those types of [unlawful] conduct fall into three broad
> categories: (1) a violation of specified federal criminal
> fraud statutes: 18 U.S.C. § 1341 (mail fraud), § 1343 (wire
> fraud), § 1344 (bank fraud), § 1348 (securities fraud); (2)
> a violation of any rule or regulation of the [Securities
> and Exchange Commission]; and/or (3) a violation of any
> provision of federal law relating to fraud against
> shareholders.

Id. at 54-55.  Under SOX, "an employee may not be terminated for

assisting in an ongoing governmental investigation into illegal

conduct, or reporting suspected violations of safety standards

that present a threat to the safety of the population at large."

Acher v. Fujitsu Network Communications, Inc., 354 F.Supp.2d 26,

29 (D.Mass. 2005) (internal citations omitted).

In a SOX claim, a plaintiff must prove that she engaged in

activity protected by the statute.  See Day v. Staples, Inc.,

555 F.3d at 52, 59-60.  A plaintiff must also establish that

there is a causal connection between her conduct and the adverse

action that was subsequently taken against her.  Id. at 53, 56.

SOX protects employees who "provide information, cause

information to be provided, or otherwise assist in an

investigation regarding any conduct which the employee

reasonably believes constitutes a violation of . . . any rule or

regulation of the Securities and Exchange Commission, or any

provision of Federal law relating to fraud against shareholders

. . .."  18 U.S.C. § 1514A(a)(1).  A key component of this is

the statutory requirement that the SOX complainant be a person

who provides information and "'reasonably believes that this

constitutes a violation.'"  Day v. Staples, Inc., 555 F.3d at

54.  As explained in Day, an employee's "'reasonable belief' has

both a subjective and objective component."  Id.  Thus, as

correctly pointed out by Lifeline, Rock's complaint or report

must articulate a fraud theory that "at least approximate[s] the

basic elements of a claim of securities fraud."  Id. at 55.

"The employee need not," however, "reference a specific statute,

or prove actual harm, but he must have an objectively reasonable

belief that the company intentionally misrepresented or omitted certain facts to investors, which were material and which risked loss." Id. at 56.

Lifeline initially argues that Rock could not have subjectively believed that the defects she was reporting constituted securities fraud or any other type of fraud listed in 18 U.S.C. § 1514A because she continued to sell those products. (Docket Entry # 55, p. 18). The fact that Rock continued to work for the company in the time period between reporting the alleged fraud and her eventual termination does not, by itself, prevent a finding that she subjectively believed she was reporting shareholder or securities fraud. See generally Stewart v. Doral Financial Corp., 997 F.Supp.2d 129, 137 (D.P.R. 2014). Despite the fact that Rock did not reference a specific statute she believed was being violated, a reasonable finder of fact could find that Rock subjectively believed that efforts to cover up defects and potential liabilities in Lifeline's primary product that she was reporting constituted fraud on the investors of the company.

Likewise, a reasonable finder of fact could find that Rock's subjective belief was objectively reasonable on the grounds that the company was incurring significant potential liabilities without informing the investors of this fact.  "'The hallmarks of fraud are misrepresentation or deceit.'" Day v.

Staples, Inc., 555 F.3d at 55 (internal citation omitted).  The
elements of a securities fraud claim "typically include a
material misrepresentation or omission, scienter, loss, and a
causal connection between the misrepresentation or omission and
the loss."  Id. at 56.  A reasonable fact finder could conclude
that failure to inform the investors about such significant
potential liabilities in Lifeline's main product could
constitute securities or shareholder fraud.  A reasonable finder
of fact could therefore find that Rock had an objectively
reasonable belief that Lifeline was intentionally deceiving
investors by omitting facts which potentially risked significant
loss and exposure to liability.

Lifeline also argues that there is no causal connection
between Rock's alleged protected conduct and the adverse
employment actions subsequently taken against her.  (Docket
Entry # 55, p. 20).  Lifeline submits that Lovell, the only
decision maker, was not aware of Rock's reports of product
defects.  Before Lifeline terminated Rock's employment, Lovell
was aware that Rock had raised issues of defective Phillips
Lifeline equipment.  (Docket Entry # 68-4, pp. 7-8).  Drawing
reasonable inferences in Rock's favor, Lovell, as Rock's
supervisor who sent the final warning letter, would also have
received the final warning letter with Rock's notations.
(Docket Entry # 56-7, p. 13).  Okrasinski, who was involved in

issuing the final warning letter and approving the termination,
knew that Rock had filed a discrimination charge against
Lifeline prior to her termination.  (Docket Entry # 68-6, p. 3)
(Docket Entry # 68-5, p. 11).  Furthermore, Berezin and
Okrasinski were aware that Rock had filed a complaint against
Lifeline with OSHA.  (Docket Entry # 68-6, p. 5).  Okrasinski
testified during his deposition that he informed Berezin, Dorman
and "legal," who had responsibility for approving the
termination, about Rock's statements concerning defective
Lifeline products.  (Docket Entry # 68-5, pp. 5, 10) (Docket
Entry # 68-4, pp. 13, 15).  A reasonable finder of fact could
easily conclude that, at a minimum, Okrasinski was in a position
to influence the ultimate employment decision.  See, e.g., Ahmed
v. Johnson, 752 F.3d at 497.  Lovell's lack of knowledge of the
MCAD or OSHA filings therefore does not require summary judgment
on the SOX claim.

     Similarly, Lifeline contends there is no temporal proximity
between Rock's alleged protected activity and the ultimate
termination of her employment.  It is well established that
"'temporal proximity' is merely one factor relevant to
causation."  Garayalde-Rijos v. Municipality of Carolina, 747
F.3d 15, 25 (1st Cir. 2014).  In the case at hand, temporal
proximity is not the only evidence of causal connection that
identifies Rock.  Rock also points to her exceptional sales

record as proof that the actions taken against her were retaliatory, as opposed to performance based. (Docket Entry # 68-2, p. 8). The time period between Rock's reporting and her actual termination is nevertheless lengthy. It is also true, however, that shortly after expressing her concerns, Rock received an email from Lovell transmitting an "Action Plan" and discussing "improvement areas." (Docket Entry # 68-1, p. 7). According to Rock, Lovell's attitude and demeanor toward her also drastically changed after she had raised the concerns over the Lifeline units catching fire. (Docket Entry # 68-1, p. 7). Thus, although temporal proximity is lacking between Rock's reporting and termination, a reasonable jury could potentially find temporal proximity between her reporting and a chain of adverse actions that culminated in her eventual termination. Accordingly, Lifeline's lack of causal connection argument does not warrant summary judgment on the SOX claim.

Next Lifeline contends that even if Rock were able to establish a prima facia case, her claim would still fail because Rock was terminated for a legitimate reason, namely, her poor job performance over a documented time period. In 2008, Rock received a low performance evaluation that was critical of her "communications and effective working relations." (Docket Entry # 68-2, p. 4). On October 14, 2009, Rock received an email from Lovell transmitting an "Action Plan" discussing "improvement

areas." (Docket Entry # 68-1, p. 7). In January 2012, Rock was placed on the two month PIP. (Docket Entry # 68-2, p. 6). Lifeline management used Rock's low call volume statistics to justify her low evaluations. (Docket # 68-2, p. 10). On March 12, 2012, Rock was given the final warning letter regarding unsatisfactory job performance. (Docket # 56-7, pp. 8-13).

Rock suggests that the negative evaluations she received were part of the retaliation against her. She cites her sales record to show that she was performing her job at an exceptional level. Rock was ranked fifth out of 19 corporate account representatives and eighth out of 36 for the entire sales group. (Docket Entry # 68-2, p. 8). She had a similar ranking for the entire six years she was in the department. (Docket Entry # 68-2, p. 8). Lifeline puts forth that there are no discrepancies in the material facts and that there is no connection between Rock's activities and the poor performance evaluations that eventually led to her termination. It also maintains that Rock's manager did not know of Rock's activities. Rock, however, provides sufficient evidence that other individuals who had to approve her dismissal did know about Rock's reports of alleged product defects. She also provides evidence that her job performance was satisfactory and did not warrant termination. Lifeline is therefore not entitled to summary judgment on the SOX claim.

IV.   <u>Retaliation (Counts VII and VIII)</u>

Lifeline seeks summary judgment on the retaliation claims in counts VII and VIII.  First, Lifeline submits that Rock failed to show a prima facie case of retaliation relative to a causal connection.  Second, Lifeline maintains that Rock cannot provide sufficient evidence that its reason to terminate her employment, i.e., deficient performance, was a pretext for retaliation.

Where, as here, there is no direct evidence of retaliation, courts use the <u>McDonnell Douglas</u> burden shifting framework.  <u>See Ponte v. Steelcase Inc.</u>, 741 F.3d 310, 321 (1st Cir. 2014) ("[r]etaliatory termination claims based on circumstantial evidence" evaluated under "<u>McDonnell Douglas</u> burden-shifting framework") (internal citation omitted).  Under this framework, the plaintiff bears the initial burden to establish the elements of a prima facie showing of retaliation.  <u>See McDonnell Douglas</u>, 411 U.S. at 802.  To make a prima facie showing of retaliation, the plaintiff must show that:  (1) she "engaged in protected conduct"; (2) she "suffered an adverse employment action"; and (3) "a causal nexus exists between the protected activity and the adverse action."  <u>Ponte v. Steelcase Inc.</u>, 741 F.3d at 321 (internal citation omitted).

This minimum showing functions to raise an inference of discrimination.  <u>See Texas Dep't of Community Affairs v.</u>

Burdine, 450 U.S. at 253-54.  The burden of production then shifts "to the employer to articulate some legitimate, nondiscriminatory reason" for the employment action.  McDonnell Douglas, 411 U.S. at 802.  If the defendant succeeds, "'the burden shifts back to the plaintiff to show that the proffered legitimate reason is in fact a pretext and that the job action was the result of the defendant's retaliatory animus.'"  Collazo v. Bristol-Myers Squibb Mfg., Inc., 617 F.3d 39, 46 (1st Cir. 2010) (internal brackets and citation(s) omitted); accord Trainor v. HEI Hospitality, LLC, 699 F.3d 19, 26 (1st Cir. 2012) (once plaintiff makes prima facie showing, burden shifts to employer "to produce evidence of a 'legitimate, non-retaliatory reason' for the adverse employment action") (internal citation omitted).  On summary judgment, the plaintiff must establish that no reasonable jury could conclude he would have faced the adverse employment actions had he not engaged in protected conduct.  See Velázquez-Pérez v. Developers Diversified Realty Corp., 753 F.3d 265, 278 (1st Cir. 2014) ("at trial, Velazquez must show that he would not have been fired had he not complained").  The requisite causal connection requires the plaintiff to "'establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer.'" Ponte v. Steelcase Inc., 741 F.3d at 321 (quoting University of Texas Southwest Medical Center v. Nassar, 133 S.Ct. 2517, 2534

(2013)).

Turning to Lifeline's first argument, it submits that temporal proximity and the mere fact that an employee files a discrimination charge does not make out a causal link.  It also asserts that Lovell, as the only decision maker, did not know that Rock filed a discrimination charge.

A prima facie showing of a causal nexus under Title VII is not established through temporal proximity by itself "if the larger picture undercuts any claim of causation." Ponte v. Steelcase Inc., 741 F.3d at 322 (internal quotation marks and citation omitted).  That said, temporal proximity between the protected activity of filing the discrimination charge on April 26, 2012, and the June 14, 2012 termination is nevertheless relevant.  See Planadeball v. Wyndham Vacation Resorts, Inc., 2015 WL 4385928, at *5 (1st Cir. July 17, 2015) (plaintiff "is correct that "'[t]emporal proximity can create an inference of causation in the proper case'") (internal citation omitted); Moreta v. First Transit of PR, Inc., 39 F.Supp.3d 169, 179 (D.P.R. 2014).  "'[C]ases that accept mere temporal proximity between an employer's knowledge of a protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case,'" however, "'uniformly hold that the temporal proximity must be "very close."'" Abril-Rivera v. Johnson, 2015 WL 4578404, at *9 (1st Cir. July 30, 2015)

(internal citation omitted).  Indeed, a gap of six months may be insufficient.  See Ahern v. Shinseki, 629 F.3d 49, 58 (1st Cir. 2010); see also Colburn v. Parker Hannafin/Nichols Portland Division, 429 F.3d 325, 337-38 (1st Cir. 2005) (four month gap did not give rise to inference of retaliatory motive).  The less than two month time period here, however, falls well within the requisite temporal proximity to make a prima facie showing. See Soto-Feliciano v. Villa Cofresí Hotels, Inc., 779 F.3d 19, 27 (1st Cir. 2015) (citing DeCaire v. Mukasey, 530 F.3d 1, 19 (1st Cir. 2008), quoting Mariani-Colón v. Dep't of Homeland Sec. ex rel. Chertoff, 511 F.3d 216, 224 (1st Cir. 2007), case involving two month time period between June 2002 allegations of discrimination and August 2002 termination sufficient to meet prima facie showing).

A prima facie case also requires a showing "'that the employer knew of the plaintiff's conduct'" of engaging in the protected activity, i.e., the filing of the discrimination charge.  Trainor v. HEI Hospitality, LLC, 699 F.3d at 26 (internal citation omitted); accord Ponte v. Steelcase Inc., 741 F.3d at 323 n.11 (noting, in context of discussing prima facie case, that "retaliating party must be aware of the protected activity that he is believed to be retaliating against").  Here, however, a jury could reasonably conclude that Lovell was not the only decision maker and that other individuals weighed in on

the decision.  See Ahmed v. Johnson, 752 F.3d at 497.  A fact finder could conclude that Berezin, Dorman and, notably, Okrasinski, were involved and made the decision to terminate plaintiff along with Lovell.  See id.  Notably, Okrasinski knew that Rock had filed the discrimination charge with the MCAD and OSHA although he denied that the filing influenced his decision to approve the termination.  Accordingly, Rock provides sufficient evidence to satisfy the prima facie showing vis-à-vis causality under the Title VII retaliation claim.  The causation standard under chapter 151B is not more stringent than Title VII's standard and, accordingly, summary judgment on either Count VII or Count VIII based on causation is not appropriate.

Lifeline next submits that Rock fails to provide sufficient evidence that the reason for the termination, namely, her poor performance, was pretextual.  Lifeline cites to Rock's poor job performance over a documented time period.  As previously noted, in 2008, Rock received a low performance evaluation that was critical of her "communications and effective working relations."  (Docket Entry # 68-2, p. 4).  On October 14, 2009, Rock received the email from Lovell transmitting the "Action Plan" discussing "improvement areas."  (Docket Entry # 68-1, p. 7).  In January 2012, Rock was placed on the two month PIP.  (Docket Entry # 68-2, p. 6).  Lifeline management used Rock's low call volume statistics to justify her low evaluations.

(Docket # 68-2, p. 10).  On March 12, 2012, Rock was given the "Final Warning Letter" regarding "unsatisfactory job performance."

As noted earlier, Rock suggests that the negative evaluations were part of the retaliation against her.  She cites statistics of her sales record to show that she was performing her job at an exceptional level.  Rock was ranked fifth out of 19 corporate account representatives and eighth out of 36 for the entire sales group.  (Docket Entry # 68-2, p. 8).  She had a similar ranking for the entire six years she was in the department. (Docket Entry # 68-2, p. 8).  Furthermore, there was a temporal proximity of less than two months.  On June 14, 2012, Rock was informed that her employment was terminated.  (Docket Entry # 68-3, p. 3).  Before the termination of Rock's employment, Berezin and Okrasinski were aware that Rock had filed a complaint against Lifeline with OSHA.  (Docket Entry # 68-6, p. 5).  Okrasinski also knew about the discrimination charge against the company.  In sum, Lifeline's arguments do not warrant summary judgment on counts VII and VIII.

V.   CPSIA Claim (Count IX)

Lifeline argues that Count IX is subject to summary judgment because the Lifeline devices that are the basis of the CPSIA claim are registered under the Federal Food, Drug, and Cosmetic Act, 15 U.S.C. §§ 301-399f ("FDCA"), which includes the

Medical Device Amendments of 1976.  Consequently, such "devices"
are not "consumer products" within the meaning of CPSIA,
according to Lifeline.  (Docket Entry # 55, p. 20).
Alternatively, Lifeline argues that Rock fails to demonstrate "a
causal connection between the conduct that she" submits was
protected by "CPSIA, on the one hand, and the adverse employment
actions taken against her on the other."  (Docket Entry # 55, p.
20).  Rock counters that Lifeline has not met its burden of
proof.  (Docket Entry # 66, p. 19).

CPSIA defines the term "consumer product" as any article
for sale to a consumer for use in or around a household or
school or any article for "the personal use, consumption or
enjoyment of a consumer in or around" a household or school.  15
U.S.C. § 2052(a)(5).  The term excludes "drugs, devices, or
cosmetics (as such terms are defined in sections 201(g), (h),
and (i) of the Federal Food, Drug, and Cosmetic Act [21 U.S.C.A.
§ 321(g), (h), and (i)])."  15 U.S.C. § 2052(a)(5)(H) (brackets
in original); see Goldsmith v. Mentor Corp., 913 F.Supp. 56, 63
(D.N.H. 1995).  Accordingly, "medical 'devices' covered by the
Federal Food, Drug, and Cosmetic Act are specifically not
included in the CPSA's definition of consumer products."  Kemp
v. Pfizer, Inc., 835 F.Supp. 1015, 1024 (E.D.Mich. 1993) (citing
15 U.S.C. § 2052)(a)(1)(H).

Because the Lifeline products at issue are registered

45

devices under the FDCA, Lifeline maintains that they are not consumer products governed by CPSIA and, consequently, are not subject to protection under the statute's whistleblower provision.  (Docket Entry # 55).  Janinia Sadlowski, a "Director, Quality & Regulatory" at Lifeline and a former quality manager at the company, attests that the Lifeline products are all "registered with and regulated by the U.S. Food and Drug Administration . . . as Class II medical devices." (Docket Entry # 58).  Lifeline therefore relies on the definition of "devices" in 21 U.S.C. § 321(h) (defining "devices") as opposed to the definitions of "drugs" in 21 U.S.C. § 321(g) or "cosmetics" in 21 U.S.C. § 321(i).

"Under the FDCA, the FDA has authority to regulate articles that are . . . 'devices'" as defined in 21 U.S.C. § 321(h) ("section 321(h)").  <u>Sottera, Inc. v. Food & Drug Admin.</u>, 627 F.3d 891, 893 (D.C.Cir. 2010).  Section 321(h) defines a "device" as:

> an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory, which is- . . .
> (2) *intended for use in the* diagnosis of disease or other conditions, or in the cure, *mitigation*, treatment, or *prevention of disease*, in man or other animals, or . . ..

15 U.S.C. § 321(h) (emphasis added).

Characterizing the definition of "device" as "broad" and noting that the component parts of a dental amalgam at issue

were classified as Class I and Class II devices, the court in
Committee of Dental Amalgam Manufacturers and Distributors v.
Stratton, 92 F.3d 807, 811 (9th Cir. 1996), held that the dental
amalgam at issue fell within the regulation of the Medical
Device Amendments to the Food, Drug and Cosmetics Act, 21 U.S.C.
§§ 321-394 ("MDA").  The broad definition of "device" in section
321(h) is also evidenced by the FDA's regulation of "[b]oth
surgeons gloves and examination gloves."  United States v. 789
Cases, More or Less, of Latex Surgeons' Gloves, an Article of
Device, 799 F.Supp. 1275, 1284-85 (D.P.R. 1992) (citing 21
C.F.R. §§ 880.6250, 878.4460, and section 321(h)).  In addition,
"Courts often will defer to an agency's reasonable
interpretation of an ambiguous provision within the agency's own
organic statute" and "[t]he FDA has consistently interpreted
'device' in a very expansive manner."  United States v. 25
Cases, More or Less, of an Article of Device, 942 F.2d 1179,
1182 (7th Cir. 1991).

     Here, the regulation and registration with the FDA of the
Lifeline products confirm that Lifeline products fall within the
above definition of a "device" in section 321(h).  The FDA
exercised jurisdiction to regulate the Lifeline products as
Class II medical devices.  Plaintiff provides no evidence to the
contrary.  Although she argues that the absence of registration
statements, registration or regulation documents or FDA

communications in the record precludes summary judgment, the uncontroverted evidence in the record (Docket Entry # 58) is undeniably sufficient to warrant summary judgment on the CPSIA claim.

## VI.   Local Rule 56.1 Statement

As a final matter, Lifeline argues that Rock has failed to file a Local Rule 56.1 statement in which she specifically addresses and controverts the material facts of record set forth in Lifeline's statement.  (Docket Entry # 69, p. 6). Accordingly, Rock admits these facts and therefore fails to raise a material dispute of fact with respect to any of her claims thus entitling Lifeline to summary judgment on all of her claims, according to Lifeline.  (Docket Entry # 69, p. 6).

The court has "great leeway in the application and enforcement of its local rules." United States v. Roberts, 978 F.2d 17, 20 (1st Cir. 1992).  It is well established that this discretion includes the authority to "interpret its own local rules in nontechnical ways." City of Waltham v. United States Postal Service, 11 F.3d 235, 243 (1st Cir. 1993).  Therefore, in this court's discretion, summary judgment is not warranted based on Rock's failure to controvert one or more of Lifeline's statements.

## CONCLUSION

In accordance with the foregoing discussion, Lifeline's

motion for summary judgment (Docket Entry # 54) is **DENIED** on counts I, II, III, IV, VI, VII, VIII and **ALLOWED** on Count IX. The deadline to file dispositive motions has passed and there shall be no extensions in this 2013 case.  This court will conduct a status conference to set a trial date on November 12, 2015 at 2:45 p.m.


/s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge